# RANDOLPH RAMIREZ *v.* HEALTH NET OF THE NORTHEAST, INC.
## (SC 17933)

Norcott, Katz, Palmer, Vertefeuille and Zarella, Js.

Argued September 17, 2007—officially released January 8, 2008

*Philip S. Walker*, with whom was *Daniel J. Foster*, for the appellant (plaintiff).

*Bradford S. Babbitt*, with whom was *Edward J. Heath*, for the appellee (defendant).

*Opinion*

NORCOTT, J. This appeal arises from the decision of the defendant health maintenance organization, Health Net of the Northeast, Inc., to terminate the plaintiff physician, Randolph Ramirez, from its network of

health care providers, after the plaintiff had signed a consent order with the Connecticut state department of public health (department), wherein his license was placed on probationary status. On appeal,[1] the plaintiff contends that the trial court improperly granted the defendant's motion for summary judgment in this action alleging breach of contract and violation of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq., because, inter alia: (1) grounds did not exist to terminate the plaintiff "for cause" under the relevant provisions of the physician agreement that governed the parties' relationship (agreement), regardless of the fact that it also contains a separate "without cause" termination provision; and (2) the termination of the plaintiff violated CUTPA in that it unfairly deprived the greater Bridgeport area of one of its few bilingual physicians, despite the fact that the medical care provided by the plaintiff was deemed appropriate. We disagree with these claims, and we affirm the judgment of the trial court.

The record reveals the following undisputed facts[2] and procedural history. The defendant is a health maintenance organization that has established a network of health care providers available to render medical services to its enrollees (network). A physician who applies to become a "participating physician" in the network must meet the defendant's credentials criteria for participating and covering physicians (credentials criteria) and be approved by its credentialing committee.

In 1998, the plaintiff applied to join the network of Physicians Health Services, Inc., the defendant's corpo-

---

[1] The plaintiff appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[2] At the request of the trial court, *Hiller, J.,* the parties filed a joint statement of facts not in dispute, including the applicable contractual provisions, in connection with their summary judgment motions.

rate predecessor. After the credentialing committee for Physicians Health Services, Inc., approved the plaintiff's application to join the network, the parties executed the agreement, which had been predrafted and was not subject to further negotiation, to govern their relationship. Among other provisions governing the parties' relationship, § 2.2 of the agreement required the plaintiff to "cooperate in and be bound and abide by all the programs, protocols, rules and regulations" prescribed in the Office Manual (manual).[3] The defendant distributes the manual, which it revises at its sole discretion from time to time, to all participating physicians, and it provides procedures for billing, referrals and authorizations, utilization review, quality assessment, medical policies and coding guidelines. The manual states further that participating physicians may be sanctioned for breaches of "[q]uality and/or [a]dministrative standards," and that the available sanctions may include termination.

The agreement also includes provisions governing the termination of the parties' relationship, both "[w]ithout [c]ause" and "[f]or [c]ause." The "[w]ithout [c]ause" provision states that the agreement may be terminated "at any time, by either party by written notice to the other party [ninety] days in advance of the date of termination stated in the notice. It is expressly understood that this provision may apply and that [the defendant] may terminate this [a]greement upon [ninety] days' written notice for any reason, including *without limitation*, restructuring the network of providers and

---

[3] Section 2.2 of the agreement requires the physician "to cooperate in and be bound and abide by all the programs, protocols, rules and regulations set forth in the [manual] including, *without limitation*, [the defendant's] quality assurance program, *credentialing process*, [m]ember grievance system and utilization management program. Without limiting the foregoing, [the defendant's] utilization management program includes precertification of *elective admissions and procedures, referral processes and reporting* of clinical encounter data. Physician shall comply with all determinations rendered in connection with the above programs." (Emphasis added.)

failure of [the] [p]hysician to be recredentialed by [the defendant] in accordance with its credentialing criteria . . . ."[4] (Emphasis added.) In contrast, the "[f]or [c]ause" provision states that the agreement may be terminated pursuant to that section with sixty days notice for a variety of enumerated reasons, including, for example, the physician's absence from the defendant's service area for a "material" period of time, the physician's insolvency or failure to maintain adequate licensure or liability insurance.[5] Finally, the termination

---

[4] The "[w]ithout [c]ause" termination provision of § 10.2 of the agreement provides in relevant part: "Notwithstanding any other provision in this Agreement, this Agreement may be terminated as follows:

"(a) Without Cause, at any time, by either party by written notice to the other party 90 days in advance of the date of termination stated in the notice. It is expressly understood that this provision may apply and that [the defendant] may terminate this Agreement upon 90 days' written notice for any reason, including without limitation, restructuring the network of providers and failure of Physician to be recredentialed by [the defendant] in accordance with its credentialing criteria, and even though grievance, discipline or termination proceedings of any kind may then be pending against Physician. . . ."

[5] The "[f]or [c]ause" termination provision of § 10.2 of the agreement provides in relevant part: "Notwithstanding any other provision in this Agreement, this Agreement may be terminated as follows . . .

"(b) For Cause, by [the defendant] in any of the following events by notice to Physician 60 days in advance of the date of termination: provided, in the event of a termination pursuant to clauses (1) and (5), [the defendant] may suspend and relieve Physician upon the occurrence of any of such events from any and all of his or her rights and obligations hereunder effective immediately upon notice to Physician:

"(1) Physician's failure to maintain adequate licensure, certification, qualification or liability insurance as required hereunder, or Physician is convicted of or pleads nolo contendere to a criminal offense; or

"(2) Physician's absence from the service area of [the defendant] for a period that is considered material by [the defendant]; [or]

"(3) The occurrence of any event that has the effect of rendering Physician unable to provide the Provider Services required under this Agreement; or

"(4) Upon Physician's insolvency, the appointment of a trustee or receiver for any substantial part of the assets of Physician; an assignment by Physician for the benefit of creditors; or the commencement of any proceedings under bankruptcy or insolvency law by or against Physician; or

"(5) [The defendant's] determination, in its sole and absolute discretion, that continuation hereof may pose an imminent threat to the health or well-being of any Member; or

provisions include "[d]ue [p]rocess [p]rotocols" that provide for an "appeal [of] the termination decision in accordance with the due process procedures set forth in the [manual]."[6]

In 2000, following allegations that he had behaved in an inappropriate manner during the examinations and treatment of three different female patients on multiple occasions during 1997, the plaintiff entered into a consent order with the department that placed his license on probationary status for three years, until April, 2003.[7]

"(6) [The defendant's] determination that Physician has failed to satisfy the criteria for participation as a Participating Physician as set forth in the [manual], including without limitation, criteria relating to quality of care, utilization management, billing practices; or

"(7) Physician is in breach of any of the terms of this Agreement and has failed to cure such default within the 60 day period; or

"(8) Physician has failed to comply with the terms of a sanction in accordance therewith; or

"(9) Physician practices as part of a group practice (that is, a partner, shareholder, member, or employee of a professional partnership, corporation or association), and, unless otherwise approved by [the defendant], any other physician in the group practice fails to maintain a Physician Agreement with [the defendant] or Physician ceases to practice as part of such group practice. . . ."

[6] The appeals provision, § 10.4 of the agreement, provides in relevant part: "Due Process Protocols. Notwithstanding any other provision of this Agreement, if [the defendant] elects to terminate this Agreement, Physician shall be entitled to appeal the termination decision in accordance with the due process procedures set forth in the [manual]. If Physician elects to appeal a termination decision pursuant to this Section 10.4, the effective date of termination shall be the 60th day following the date a final decision is rendered. Except as set forth herein and unless otherwise required by law, any . . . decision to terminate pursuant to this Article X shall be final and Physician shall have no right to appeal the decision of [the defendant] through any formal or informal administrative hearing or review process, nor shall Physician have any other due process right to appeal [the defendant's] decision to terminate this Agreement." See footnote 11 of this opinion for the appeals procedure as set forth in the manual.

[7] The consent order recited that the department has alleged that: "1. On or about June 16, 1997 [the plaintiff] removed a boil from patient D.F.'s inner front thigh. After the assisting nurse left the room, [the plaintiff] performed a rectal examination of D.F. No notation of the rectal examination appeared in D.F.'s medical record.

"2. On three occasions between June 1997 and August 1997 [the plaintiff] examined female patient C.P. for fatigue. On or about June 20, 1997, [the

The consent order recited that the plaintiff, although admitting no guilt or wrongdoing, nevertheless had "chosen not to contest" those allegations, and thus the department never was required to prove them.[8] The consent order did not "restrict or impair" the plaintiff's ability to practice medicine, other than to require him to have a female present "during any examination or treatment of a disrobed or partially disrobed female patient."[9] The department subsequently notified the defendant that it had placed the plaintiff's license on probationary status.

Thereafter, in August, 2001, Mike Oesau, the defendant's medical director, sent a letter to the plaintiff terminating his membership in the network, effective ninety days from the receipt of that letter. The letter informed the plaintiff that "you no longer meet the credentials criteria for participation" since "you have a probationary status on your medical license and your license is permanently restricted . . . ."[10] The letter advised the plaintiff that he could appeal the termina-

plaintiff] conducted a full examination of C.P. During the second office visit on or about August 11, 1997, [the plaintiff] conducted a second full examination. During this second visit, C.P. was fully disrobed and [the plaintiff] asked C.P. questions regarding her sexual behavior. C.P. returned for a third visit on or about August 20, 1997. During the third examination, [the plaintiff] requested C.P. to perform back and leg stretches while C.P. was nude. C.P. refused [the plaintiff's] request to perform an anal examination.

"3. On or about April 2, 1997 [the plaintiff] treated female patient J.S. During an examination of J.S. for foot and back problems, [the plaintiff] requested J.S. to undress. While J.S. was wearing only underwear, [the plaintiff] requested J.S. to bend over in front of [the plaintiff] as part of a spinal assessment."

[8] Although the plaintiff had the opportunity to consult with an attorney prior to signing the consent order, he was not represented by counsel when he negotiated the terms of the consent order with the department.

[9] The consent order also required the plaintiff to undergo a mental health evaluation by a psychiatrist or psychologist whom the department had preapproved.

[10] The credentials criteria, which are included in the manual, are incorporated by reference in the agreement, and provide that the "[p]hysician must have and maintain a current and unrestricted license to practice medicine granted by each [s]tate where he or she has an office listing with [the defendant]." They also state that the physician must meet certain minimum

tion in writing pursuant to procedures set forth in the manual.[11]

educational requirements, including completion of an accredited residency program, and further require that a "[p]hysician must have and maintain a current and unrestricted license to practice medicine granted by each [s]tate where he or she has an office listing with [the defendant]. *Any provider whose license is in a probationary status is not eligible for membership.*" (Emphasis added.) When he was accepted into the network, the plaintiff had a current and unrestricted license, which was not on probationary status.

[11] The manual's appeals procedure provides in relevant part: "A. Situations when no Appeal Provided

"Termination shall be immediate upon notice, and this Appeals process will NOT apply in cases involving:

"Breach of contract for reasons other than (i) failure to follow quality standards, or (ii) failure to meet credentialing criteria . . .

"Risk of imminent harm to patient

"A determination of fraud

"A final disciplinary action by State licensing board or other governmental agency that impairs the Provider's ability to practice.

"B. Appeal

"Provider may appeal a Plan termination decision by filing a request for appeal within thirty (30) days of Provider's receipt of the termination notice. The request shall be sent by certified mail or hand delivered to the person serving as the Plans Senior Medical Director, Chief Administrative Officer or his or her representative.

"C. Appeal Panel

"Following receipt of the request for appeal, a hearing panel shall be selected by the Plan, and the appeal review shall be held within the time frame specified in the provider contract. The Panel shall consist of three persons including a Plan Medical Director and at least one person who shall be a clinical peer in the same discipline and the same or similar specialty as the Provider requesting the appeal. Such clinical peers shall be from outside the geographic area in which Provider practices. During the appeal, the Provider may be represented by counsel, but there shall be no right of discovery. The proceedings for the appeal shall be informal. The rules of evidence recognized in courts will not apply.

"D. Appeal Procedure

"A Plan representative shall present information supporting the decision to terminate. Provider may then present information or evidence pertinent to the appeal. The Panel shall have the right, in its sole discretion, to hear or exclude information provided to it by either the Plan representative or the Provider. The Panel shall also have the right to request the Plan representative or the Provider to submit additional information.

"E. Panel Decision

"The Panel shall provide Provider with a written decision in a timely manner which will not exceed thirty (30) days from the date of the appeal. The Panel's decision will include a brief statement of the reasons for the Panel's decision and either: (i) a reinstatement of Provider; (ii) a provisional

Thereafter, the plaintiff took an internal appeal from the defendant's decision to terminate him from the network, and the defendant notified the plaintiff that his appeal would be heard by a panel of three physicians, specifically Robert Willig, a medical director for the defendant, and two out-of-state physicians, Scott Breidbart and Stephen Friedhoff. The plaintiff did not know that Breidbart and Friedhoff, who resided out of state, were employees of the defendant.[12]

In November, 2001, the panel heard the appeal at the defendant's office in Shelton. Willig was physically present at the hearing, but Breidbart and Friedhoff participated by telephone without objection from the plaintiff.[13] The plaintiff testified before the panel, and his counsel addressed the panel and submitted documentary evidence. The plaintiff described his reasons for entering into the consent order with the department, the factual circumstances giving rise to those cases, and the nature and scope of his practice. The panel then deliberated over two days, and voted unanimously to uphold the defendant's decision to terminate the plaintiff.[14]

---

reinstatement subject to the conditions set forth by the Plan; or (iii) a decision to uphold the termination. The Panel's decision shall be final, and there shall be no further right of review or appeal."

[12] Maura Geirin, the defendant's compliance and credentials manager, stated in her affidavit that the defendant's employees and affiliated providers who serve on appeal panels receive no positive or negative incentives with respect to how they decide the appeals, and that their compensation is determined independently of the result of appeals.

[13] The defendant's appeal procedures do not require the panel members' physical presence when they hear the appeal.

[14] According to the minutes from its deliberations, the panel noted that only one of the patients had complained to the department, which then extracted complaints from the other two patients. Friedhoff felt that the examinations in question seemed "reasonable for the complaints and that . . . the issue is that he did not have a chaperone present not that there was sexual misconduct involved." After the panel recessed to determine whether any of the defendant's members had complaints against the plaintiff, they reconvened and Maura Geirin reported to them that no such complaints had been filed. Breidbart noted that, although other physicians on probation

Thereafter, the plaintiff brought this action alleging that the defendant had breached the agreement when it terminated his network participation, and seeking compensatory and punitive damages, injunctive relief and attorney's fees and costs. The plaintiff also alleged that, because the defendant's policies and credentials criteria were silent about the effect of probationary status, and the appeals process was a sham, the defendant had violated CUTPA by terminating him. After the trial court, *Thim*, *J.*, denied the plaintiff's motion for a temporary injunction, the defendant moved, and the plaintiff cross moved, for summary judgment pursuant to Practice Book § 17-44 et seq.

The trial court, *Hiller*, *J.*, concluded that the defendant properly had terminated the plaintiff's network membership pursuant to the unambiguous language of the agreement's " 'without cause' " provision because it had given the plaintiff the requisite ninety days notice, and the clause permits termination for " 'any reason.' " The trial court also concluded that there were no genuine issues of material fact with respect to the plaintiff's CUTPA claim because the defendant had followed all of its appeal procedures and the appeal process was not "unfair, deceptive, immoral or unethical." Accordingly, the court granted the defendant's motion and denied the plaintiff's cross motion for summary judgment. The trial court then denied the plaintiff's motion for reargument, and rendered judgment accordingly. This appeal followed.

"As a preliminary matter, we set forth the appropriate standard of review. In seeking summary judgment, it is the movant who has the burden of showing the

---

were permitted to remain network members, the issues surrounding their probation did not involve patients or medical care, unlike this case. Friedhoff then stated that, although he could "see both sides," he had "concerns about the exposure to [the defendant's] members if [the plaintiff] was allowed to stay on the [network]." The panel then upheld the termination.

nonexistence of any issue of fact. The courts are in entire agreement that the moving party for summary judgment has the burden of showing the absence of any genuine issue as to all the material facts, which, under applicable principles of substantive law, entitle him to a judgment as a matter of law. The courts hold the movant to a strict standard. To satisfy his burden the movant must make a showing that it is quite clear what the truth is, and that excludes any real doubt as to the existence of any genuine issue of material fact. . . . As the burden of proof is on the movant, the evidence must be viewed in the light most favorable to the opponent. . . . When documents submitted in support of a motion for summary judgment fail to establish that there is no genuine issue of material fact, the nonmoving party has no obligation to submit documents establishing the existence of such an issue. . . . Once the moving party has met its burden, however, the opposing party must present evidence that demonstrates the existence of some disputed factual issue. . . . It is not enough, however, for the opposing party merely to assert the existence of such a disputed issue. Mere assertions of fact . . . are insufficient to establish the existence of a material fact and, therefore, cannot refute evidence properly presented to the court under Practice Book § [17-45]. . . . Our review of the trial court's decision to grant [a] motion for summary judgment is plenary." (Internal quotation marks omitted.) *Zielinski* v. *Kotsoris*, 279 Conn. 312, 318–19, 901 A.2d 1207 (2006).

I

We begin with the plaintiff's claim that the defendant breached the agreement by terminating him in violation of the "for cause" provision. The plaintiff contends that the availability of the appeal process indicates that his termination had to have occurred under that clause, rather than the "without cause" provision because,

under the agreement, a terminated physician has no right to appeal unless the termination is "for cause." Thus, the plaintiff argues that the trial court improperly concluded that the defendant had not breached the agreement because "for cause" terminations are available only for certain enumerated reasons, none of which includes the physician's license having been placed on probationary status.[15] In sum, the plaintiff contends that the defendant's interpretation renders the "for cause" provision meaningless because the defendant's rationale would give it "the absolute right to terminate any physician from its network, upon [ninety] days notice, and . . . the physician would have no recourse."[16]

In response, the defendant contends that the "plain language of the . . . agreement permitted termination 'for any reason,' " with the requisite ninety days notice under the " 'without cause' " provision. The defendant argues that it is undisputed that the plaintiff received ninety days notice, and that "no facts support the contention that [it] terminated [the plaintiff] under the 'for cause' provision . . . ." It emphasizes that there is a difference between having a "reason" to terminate the agreement, as opposed to terminating the agreement " 'for cause.' " Indeed, the defendant notes that the plaintiff's construction "defies common sense," and that the " 'without cause' " provision itself gives specific reasons for such termination, which makes clear that

---

[15] Accordingly, the plaintiff contends that the termination letter, which advised him of a right to appeal, "effectively conceded that [the defendant's] termination decision was '[f]or [c]ause' . . . . Under these circumstances, it was necessary for [the defendant] to establish that it terminated [the plaintiff] for one or more of the reasons set forth in the agreement justifying termination '[f]or [c]ause.' "

[16] Noting that the defendant previously has allowed other physicians whose licenses were placed on probation to remain members of the network, the plaintiff further contends that the agreement is a contract of adhesion that should be construed against the defendant, its drafter, and that had the defendant desired to make probationary status a reason for suspension of membership, it could have done so.

its applicability is not limited only to terminations for no reason at all. Moreover, the defendant notes that an appeal is available for termination under either provision, and that the "for cause" provision is not surplusage because, in comparison, it: (1) may only be invoked by the defendant; (2) permits the defendant to provide less notice to the physician; and (3) permits the defendant to suspend a physician immediately in certain circumstances. We agree with the defendant's construction of the agreement.[17]

The law governing the construction of contracts is well settled. "When a party asserts a claim that challenges the trial court's construction of a contract, we must first ascertain whether the relevant language in the agreement is ambiguous. . . . A contract is ambiguous if the intent of the parties is not clear and certain from the language of the contract itself. . . . Accordingly, any ambiguity in a contract must emanate from the language used in the contract rather than from one party's subjective perception of the terms. . . . When the language of a contract is ambiguous, the determination of the parties' intent is a question of fact . . . ." (Citations omitted; internal quotation marks omitted.) *David M. Somers & Associates, P.C.* v. *Busch*, 283 Conn. 396, 402–403, 927 A.2d 832 (2007).

Similarly, "[w]e accord the language employed in the contract a rational construction based on its common, natural and ordinary meaning and usage as applied to the subject matter of the contract. . . . Where the language is unambiguous, we must give the contract effect according to its terms. . . . Where the language is

---

[17] The defendant further argues that, "even if [it] had terminated [the plaintiff] under the 'for cause' provision, doing so would have been consistent with [the] . . . credentials criteria and, therefore, would not have breached the . . . agreement." We need not reach this contention in light of our conclusion that the termination was proper under the "without cause" provision.

ambiguous, however, we must construe those ambiguities against the drafter." (Citations omitted.) *Cantonbury Heights Condominium Assn., Inc.* v. *Local Land Development, LLC*, 273 Conn. 724, 735, 873 A.2d 898 (2005). Moreover, in construing contracts, we give effect to all the language included therein, as "the law of contract interpretation . . . militates against interpreting a contract in a way that renders a provision superfluous." (Internal quotation marks omitted.) *Wesley* v. *Schaller Subaru, Inc.*, 277 Conn. 526, 546, 893 A.2d 389 (2006).

We conclude that the trial court correctly determined that the defendant properly terminated the plaintiff's membership pursuant to the agreement's "without cause" provision. This provision is plain and unambiguous, and permits the defendant to terminate the agreement "upon [ninety] days' written notice for *any reason*, including *without limitation*, restructuring the network of providers and failure of [p]hysician to be recredentialed by [the defendant] in accordance with its credentialing criteria, and even though grievance, discipline or termination proceedings of any kind may then be pending against [p]hysician." (Emphasis added.) This broad and inclusive language, specifically the use of the word "any," gives the defendant expansive rights with respect to the membership status of its network physicians. See, e.g., *Fink* v. *Golenbock*, 238 Conn. 183, 196, 680 A.2d 1243 (1996) (describing arbitration clause governing " '[a]ny disputes arising under [the employment agreement]' " as having language that is "all-embracing, all-encompassing and broad"); cf. *Beizer* v. *Goepfert*, 28 Conn. App. 693, 699, 613 A.2d 1336 (quoting dictionary definition of " '[a]ny' " in concluding that "phrase 'any contract action' also lends itself to a broad construction of what claims are included" under attorney trial referee statute, General Statutes § 52-549n), cert. denied, 224 Conn. 901, 615 A.2d 1044 (1992),

cert. denied, 507 U.S. 973, 113 S. Ct. 1416, 122 L. Ed. 2d 786 (1993).

Indeed, this reading of the agreement does not render the "for cause" provision superfluous. That section is far more draconian for the physician than is the "without cause" provision, and is more limited in its applicability. It is available only in nine discrete factual situations, including when a physician "fail[s] to maintain adequate licensure, certification, qualification or liability insurance," is "convicted of or pleads nolo contendere to a criminal offense," or that the physician's continued participation "may pose an imminent threat to the health or well-being of any [m]ember . . . ." See footnote 5 of this opinion. This clause also permits the defendant to remove a physician from its network far more expediently than the "without cause" provision because it allows termination with thirty days fewer notice, and also provides for the immediate suspension of a physician for certain specified violations.

Moreover, the fact that the plaintiff was offered an appeal does not render the termination one "for cause," because the appeals provisions set forth in both the agreement and the manual are triggered by "termination decision[s]," not "termination decisions *for cause.*" (Emphasis added.) See footnotes 6 and 11 of this opinion. Indeed, under the manual, there is no entitlement to an appeal for all of the "for cause" terminations, as the appeals procedure, incorporated by reference into the agreement, provides that "[t]ermination shall be immediate upon notice, and this Appeals process will NOT apply in cases involving: Breach of contract for reasons other than (i) failure to follow quality standards, or (ii) failure to meet credentialing criteria . . . Risk of imminent harm to patient . . . A determination of fraud . . . A final disciplinary action by State licensing board or other governmental agency that impairs the Provider's ability to practice." Accordingly, we disagree

with the plaintiff's arguments with respect to the significance of the appeals process provision because it is well settled that we "will not import terms into [an] agreement . . . that are not reflected in the contract." *Gibson* v. *Capano*, 241 Conn. 725, 732, 699 A.2d 68 (1997).

Finally, that the defendant had, and stated, a reason to terminate the plaintiff did not "transform" the nature of the termination or otherwise deprive the defendant of the use of the "without cause" provision. "The ordinary meaning of a without cause provision is that it includes cause, no cause, or even a reason morally indefensible." *Biber* v. *Duplicator Sales & Service, Inc.*, 155 S.W.3d 732, 735 (Ky. App. 2004) (concluding that "termination without cause" provision in computer network consulting contract "is not transformed into a 'for cause only' provision because the party terminating the contract notifies the other party that the contract is being terminated for cause"); cf. *Wisehart* v. *Meganck*, 66 P.3d 124, 129 (Colo. App. 2002) (rejecting argument that "although the bank had the right to terminate [the plaintiff] with or without cause and for any reason, the fact that it claimed to have terminated him with cause and for a specific reason transformed the employment relationship from at will to one in which he could only be terminated for good cause"), cert. denied, 2003 Colo. LEXIS 265 (March 24, 2003). Accordingly, we conclude that the trial court properly granted the defendant's motion for summary judgment with respect to the plaintiff's breach of contract claims.[18]

---

[18] The plaintiff also claims that the defendant breached its duty of good faith and fair dealing when it terminated him. "[E]very contract carries an implied duty requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement. . . . The covenant of good faith and fair dealing presupposes that the terms and purpose of the contract are agreed upon by the parties and that what is in dispute is a party's discretionary application or interpretation of a contract term. . . . To constitute a breach of [the implied covenant of good faith and fair dealing], the acts by which a defendant allegedly impedes the plaintiff's

## II

The plaintiff next contends that the trial court improperly granted the defendant's motion for summary judgment with respect to his CUTPA claim because the defendant's conduct during his termination, specifically the appeal process, was unfair and deceptive.[19] Specifically, the plaintiff argues that the

right to receive benefits that he or she reasonably expected to receive under the contract must have been taken in bad faith." (Internal quotation marks omitted.) *Renaissance Management Co.* v. *Connecticut Housing Finance Authority*, 281 Conn. 227, 240, 915 A.2d 290 (2007). The trial court acknowledged, but did not address this claim, which the plaintiff renewed in his motion to reargue. Even if we were to assume that the plenary scope of review applicable to motions for summary judgment allows us to review the claim, notwithstanding the trial court's failure to rule on it; see, e.g., *Miller's Pond Co., LLC* v. *New London*, 273 Conn. 786, 815 n.27, 873 A.2d 965 (2005); we nevertheless decline to address it because the plaintiff's brief is inadequate on this point. Specifically, the plaintiff's brief lacks any analysis beyond a single citation to the boilerplate law of the duty of good faith and fair dealing. There is no citation or discussion of any evidence in the record that would purport to support the plaintiff's claim of bad faith. See, e.g., *Rocque* v. *Northeast Utilities Service Co.*, 254 Conn. 78, 86–87, 755 A.2d 196 (2000) (claim lacking legal analysis or discussion of relevant "facts or evidence in the record" is "quintessential example of inadequate briefing of an appellate claim").

[19] The plaintiff also argues that the trial court improperly concluded that he had failed to "[provide] any competent evidence that may be considered in opposition to [the defendant's] motion for summary judgment nor in support of [his] own cross motion for summary judgment because none of his submissions are authenticated." See, e.g., *Cogswell* v. *American Transit Ins. Co.*, 282 Conn. 505, 533–34, 923 A.2d 638 (2007) (rules of practice require that evidence offered in connection with summary judgment motion must be admissible under Practice Book § 17-46). The plaintiff argues that the trial court, therefore, dismissed his CUTPA claim sua sponte, "on technical grounds, without any substantive consideration of the documents supporting the motion," particularly because the defendant "never objected that the documents submitted by [the plaintiff] with his motion were not authenticated," and those same documents already had been submitted to the trial court in certified or authenticated form by the defendant. In response, the defendant contends that the trial court considered all of this evidence because "the relevant information contained in the documents that the trial court excluded already lay before the trial court through the parties' joint submission. Hence, the exclusion of the exhibits offered by [the plaintiff] was necessarily irrelevant." Because the trial court reached the merits of

defendant's "ritualistic observance of the procedural niceties in terminating [him] (e.g., notice by registered mail, [ninety] days notice, etc.) does not cure the fundamental unfairness of its termination on grounds not recognized by the agreement and rubber-stamped by its own managerial employees. [The defendant] celebrates form over substance." The plaintiff further relies on our decision in *Owens* v. *New Britain General Hospital*, 229 Conn. 592, 643 A.2d 233 (1994), a hospital privileges case, in support of the proposition that public policy favors fairness in the termination of physicians from insurers' provider networks, and maintains that public policy does not support his termination because the appeals panel concluded that he had provided appropriate medical care. The plaintiff contends further that these actions by the defendant caused "substantial injur[ies]" to him and his patients because he is "one of the few bilingual physicians in the [g]reater Bridgeport area, and the only Hispanic [physician] in the entire city of Stratford. Many of [the plaintiff's] former patients can no longer treat with [him], because their health care plans afford coverage only by physicians who are in [the defendant's] network of providers." In response, the defendant argues that, even if *Owens* is applicable in this context, the termination did not violate public policy because the defendant adhered to the plain and unambiguous terms of the agreement and the termination was founded on concerns for patient safety, given the events that led to the consent agreement with the department. The defendant also argues that, for the same reasons, the termination was not unfair or deceptive. We agree with the defendant, and conclude that the plaintiff's CUTPA claims lack merit.

"[General Statutes §] 42-110b (a) provides that [n]o person shall engage in unfair methods of competition

the plaintiff's CUTPA claim, and the plaintiff has not addressed any evidence that the trial court failed to consider that would otherwise have affected the outcome in this case, we decline to reach this claim on appeal.

and unfair or deceptive acts or practices in the conduct of any trade or commerce. It is well settled that in determining whether a practice violates CUTPA we have adopted the criteria set out in the cigarette rule by the federal trade commission for determining when a practice is unfair: (1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers, [competitors or other businesspersons]. . . . All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." (Internal quotation marks omitted.) *Ventres* v. *Goodspeed Airport, LLC*, 275 Conn. 105, 154–55, 881 A.2d 937 (2005), cert. denied, 547 U.S. 1111, 126 S. Ct. 1913, 164 L. Ed. 2d 664 (2006). "Thus a violation of CUTPA may be established by showing either an actual deceptive practice . . . or a practice amounting to a violation of public policy." (Internal quotation marks omitted.) *Glazer* v. *Dress Barn, Inc.*, 274 Conn. 33, 82–83, 873 A.2d 929 (2005). "In order to enforce this prohibition, CUTPA provides a private cause of action to [a]ny person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a [prohibited] method, act or practice . . . . ." (Internal quotation marks omitted.) *Stevenson Lumber Co.-Suffield, Inc.* v. *Chase Associates, Inc.*, 284 Conn. 205, 213–14, 932 A.2d 401 (2007), quoting General Statutes § 42-110g (a).

We begin with the defendant's first CUTPA argument, namely, that the termination violated public policy as

expressed in our decision in *Owens* v. *New Britain General Hospital*, supra, 229 Conn. 592. In *Owens*, we concluded that "a substantial compliance test . . . is the proper test by which to measure whether a hospital has sufficiently complied with its bylaws in terminating a physician's medical staff privileges" because of the "overarching function that medical staff bylaws are designed to serve—the provision of quality medical care to the surrounding public community. . . . Medical staff bylaws reflect what the medical community considers to be crucial to the effective administration of the hospital and the provision of quality medical care by physicians whose performance has earned them privileges. At the same time, the procedural protocol of the bylaws provide, outside of the judicial system, a fair method for making decisions concerning staff privileges." (Citation omitted; internal quotation marks omitted.) Id., 604. We stated that "the obligation to follow medical staff bylaws is paramount and that a hospital must afford its medical staff all the process and protections encompassed by its bylaws," because that obligation "can stem from a contractual relationship between the hospital and the physician," "a preexisting legal duty imposed by our state department of health regulations," and "the public's substantial interest in the operation of hospitals, public or private." Id., 604–605. We emphasized that the "public has an interest that staff decisions are not made arbitrarily. By requiring hospitals to adhere to their bylaws, the risk of arbitrary decisions is reduced." Id., 606.

Even if we were to assume, without deciding, that there is a public interest inherent in a health maintenance organization's decisions with respect to credentialing physicians and, therefore, that the agreement is analogous to the hospital bylaws contemplated in *Owens*, the plaintiff's claim fails.[20] We already have con-

[20] In his brief, the plaintiff cites several cases in support of the proposition that there is a public interest in the relationship between health maintenance

cluded that the defendant did not breach the agreement in its termination of the plaintiff. See part I of this opinion. Thus, the defendant already has, at the very least, "substantially complied" with its procedures under that agreement, and we will not interfere with the reviewing panel's exercise of discretion. See *Owens* v. *New Britain General Hospital*, supra, 229 Conn. 606–607 (Noting that hospital "decisions concerning whether a physician is entitled to staff privileges should be left to the expertise of the hospital's staff and administration. The exercise of their discretion should be subject only to limited judicial surveillance to determine if the hospital substantially complied with its applicable bylaw procedures.").

The plaintiff next argues that the termination was " 'immoral, unethical, oppressive or unscrupulous' " because the defendant cited the probationary status of his license as its reason and the appeals panel upheld the termination, despite the fact that the defendant had not terminated the membership of other physicians whose licenses had been placed on probation. The

organizations and their member physicians. See, e.g., *Potvin* v. *Metropolitan Life Ins. Co.*, 22 Cal. 4th 1060, 1071, 997 P.2d 1153, 95 Cal. Rptr. 2d 496 (2000) ("Our conclusion that the relationship between insurers and their preferred provider physicians significantly affects the public interest does not necessarily mean that every insurer wishing to remove a doctor from one of its preferred provider lists must comply with the common law right to fair procedure. The obligation to do so arises only when the insurer possesses power so substantial that the removal significantly impairs the ability of an ordinary, competent physician to practice medicine or a medical specialty in a particular geographic area, thereby affecting an important, substantial economic interest."); *Harper* v. *Healthsource New Hampshire, Inc.*, 140 N.H. 770, 776–77, 674 A.2d 962 (1996) (concluding that public's "substantial interest in the relationship between health maintenance organizations and their preferred provider physicians" "does not eliminate a health maintenance organization's contractual right to terminate its relationship with a physician without cause," although physician is entitled to judicial review if "terminated without cause and the physician believes that the decision to terminate was, in truth, made in bad faith or based upon some factor that would render the decision contrary to public policy").

plaintiff states further that this action was as immoral and unethical as the breach of the agreement in the first place.[21] Ordinarily, "[w]hether a practice is unfair and thus violates CUTPA is an issue of fact. . . . The facts found must be viewed within the context of the totality of circumstances which are uniquely available to the trial court."[22] (Internal quotation marks omitted.) *De La Concha of Hartford, Inc.* v. *Aetna Life Ins. Co.*, 269 Conn. 424, 434, 849 A.2d 382 (2004). In the present case, however, the plaintiff's claims fail as a matter of law because he has alleged nothing more than that, in terminating his membership, the defendant had availed itself of the rights afforded under the plain and unambiguous terms of the agreement, none of which was hidden or otherwise withheld from the plaintiff. Moreover, the defendant's appeals panel distinguished the plaintiff's case from that of other physicians whose licenses had been placed on probation because those other cases did not implicate patient safety. Cf. *Nazami* v. *Patrons Mutual Ins. Co.*, 280 Conn. 619, 625–27, 910 A.2d 209 (2006) (alleged misrepresentations on certificate of insurance not actionable under CUTPA based on clarity

[21] The plaintiff also notes that his termination puts him in the difficult and damaging position of having to disclose that termination to other networks in which he would like to participate. The impact of his need to disclose the termination might impact the causation and "ascertainable loss" inquiries under CUTPA; see General Statutes § 42-110g (a); but not the threshold liability determination, which requires a prohibited act in the first instance. See, e.g., *Stevenson Lumber Co.-Suffield, Inc.* v. *Chase Associates, Inc.*, supra, 284 Conn. 213–14 (noting that CUTPA enforces prohibition of "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce" by "provid[ing] a private cause of action to [a]ny person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a [prohibited] method, act or practice" [internal quotation marks omitted]).

[22] By way of analogy, in the consumer context, the "Federal Trade Commission has identified the four primary categories of practices which have been prohibited as unfair: (1) withholding material information; (2) making unsubstantiated advertising claims; (3) using high-pressure sales techniques; and (4) depriving consumers of various post-purchase remedies." (Internal quotation marks omitted.) *A-G Foods, Inc.* v. *Pepperidge Farm, Inc.*, 216 Conn. 200, 216 n.9, 579 A.2d 69 (1990).

of certificate's language about distinction between policy expiration and policy cancellation); *Votto* v. *American Car Rental, Inc.*, 273 Conn. 478, 485, 871 A.2d 981 (2005) (upholding findings of CUTPA violations based on conclusions that "[t]he defendant's use of the plaintiff's signature on a blank credit card slip to charge the plaintiff more than twice the amount of the estimated cost of repair to the vehicle was without question unscrupulous, immoral and oppressive," and that "[t]he defendant's only attempt to settle the dispute over the vehicle damage was to give the plaintiff a misleading business card for a phantom legal department in Greenwich, where no telephone calls were accepted"); *Haynes* v. *Yale-New Haven Hospital*, 243 Conn. 17, 38–39, 699 A.2d 964 (1997) (CUTPA claim against hospital failed because it properly held itself out as major trauma center pursuant to its certification, and claims with respect to staffing levels and adequacy of procedures fell into category of professional negligence not covered by CUTPA).

With respect to the third criterion of the cigarette rule, namely, that the termination decision has caused "substantial injury" to consumers, the plaintiff cannot prevail because he offered no evidence in the trial court in support of his claim that Spanish speaking residents of the greater Bridgeport area had been injured. Specifically, the plaintiff did not provide any information beyond a bald assertion in his brief that he is the only Spanish speaking physician in the city of Stratford, and that his removal from the defendant's network will leave significant numbers of Spanish speaking patients without access to medical care. Accordingly, because the plaintiff has failed to satisfy any criteria under the cigarette rule, we conclude that the trial court properly granted the defendant's motion for summary judgment dismissing his CUTPA claims.

The judgment is affirmed.

In this opinion the other justices concurred.