JOHN P. KENDALL ET AL. *v.* BRUCE D.
AMSTER ET AL.
(AC 26191)

Lavine, Robinson and Stoughton, Js.

Argued March 17—officially released June 10, 2008

*Thomas C. C. Sargent*, with whom was *Daniel Jacobs*, for the appellants (defendant Colton Amster et al.).

*Michael P. Shea*, with whom were *Thomas J. O'Neil* and, on the brief, *Thomas D. Goldberg*, for the appellees (plaintiffs).

*Opinion*

ROBINSON, J. The defendants Colton Amster and Red Line Restorations, LLC (Red Line),[1] appeal from the judgment of the trial court granting a prejudgment remedy in favor of the plaintiffs, John P. Kendall and Carl Jenkins.[2] On appeal, the defendants claim that the court improperly (1) found that there was probable cause to grant the prejudgment remedy, and (2) issued a prejudgment remedy attaching $5.6 million of Red Line's property or assets and $650,000 of Amster's property or assets. We affirm the judgment of the trial court.

The record reveals the following facts and procedural history. On December 22, 1999, the Massachusetts Superior Court rendered judgment in favor of Kendall and against Bruce D. Amster and certain entities controlled by him. This judgment stemmed from a failed business relationship between Kendall and Bruce Amster. Bruce Amster, through his business, Hyannis Restorations,[3] had purchased and restored vintage automobiles for Kendall. The jury found that Bruce Amster had acted

---

[1] The defendant Bruce D. Amster is not a party to this appeal. Accordingly, we refer to Colton Amster and Red Line as the defendants.

[2] Kendall is a judgment creditor of Bruce D. Amster and of certain Massachusetts business entities that had been controlled by Bruce Amster. Jenkins is the receiver appointed by the Massachusetts Superior Court.

[3] Bruce Amster was the owner of two companies, Hyannis Restorations International Sales, Inc., and Hyannis Auto Restorations, Inc., which did business as Hyannis Restorations.

in a fraudulent manner with respect to his dealings with Kendall.[4] The total amount of the judgment, including interest and costs, exceeded $5.5 million.

On March 12, 2000, the Massachusetts court entered a receivership order and appointed Jenkins as the receiver. The order required Bruce Amster and Hyannis Restorations to transfer to Jenkins, on a weekly basis, all real and personal property received in the course of their personal or business affairs, including any income, assets, revenues, things of value, classic automobiles, commissions, broker's fees or payment for restoration or automobile dealer work. The order further instructed Bruce Amster and Hyannis Restorations to cooperate with Jenkins and not to take "any action, directly or indirectly to hinder, obstruct, or otherwise interfere with [Jenkins] in the conduct of [his] duties or to interfere in any manner, directly or indirectly, with the custody, possession, management, or control by [Jenkins] of the funds, assets, and premises . . . ."

---

[4] In its memorandum of decision, the Massachusetts Superior Court stated: "Based upon the jury's findings, as well as the evidence presented by the parties at trial, this court found that [Bruce] Amster and Hyannis Restorations employed and engaged in unfair, deceptive acts when they intentionally, knowingly, willfully and with the intent to defraud Kendall: (a) misrepresented the purchase prices of the automobiles, and converted for their own personal use the difference between what Kendall paid for the automobiles and what was actually paid to the sellers of the automobiles; (b) submitted false credit card statements in order to obtain reimbursement for personal expenses; (c) submitted false or inflated invoices for insurance obtained in connection with the transatlantic shipment of one of the automobiles; (d) submitted false or inflated invoices in order to obtain reimbursement for sales tax and registration fees which had not been paid; and (e) submitted false or inflated invoices in connection with the restoration of certain automobile parts and components. These acts were immoral and unethical and caused substantial injury to Kendall in violation of [Mass. Gen. Laws] c. 93A. Moreover, this court found the conduct of Hyannis Restorations and [Bruce] Amster to be so unscrupulous as to subject them to exemplary damages pursuant to . . . c. 93A, § 9 (3). Further, this court found the conduct of [Bruce] Amster in cheating Kendall was so egregious as to shock the conscience of any reasonable person, thereby warranting treble damages."

On December 5, 2000, the Massachusetts court found Bruce Amster and Hyannis Restoration in contempt for violations of the receivership order. Specifically, the court determined that Amster had set up a "straw corporation," Hyannisport Restorations,[5] to which Bruce Amster had transferred the assets and good will of Hyannis Restorations, engaged in improper financial transactions, including withdrawing and transferring assets, and obstructed Jenkins from performing as the receiver. The "straw man" of Hyannisport Restorations was Bruce Amster's father. The court subsequently modified the receivership order to include Hyannisport Restorations, as well as any other corporate entity controlled by Bruce Amster. The court later found the corporate entities, Bruce Amster and his accountant, to be in wilful contempt.[6]

Following the Massachusetts proceedings, Bruce Amster moved to Connecticut. He and his son, Colton Amster, were employed by Pray Automotive Restoration Corporation (Pray). During this time, Bruce Amster endorsed his paychecks from Pray over to Colton Amster, who cashed them. This income was not reported

[5] A "straw man" or "straw party" is defined as "[a] front; a third party who is put up in name only to take part in a transaction. Nominal party to a transaction . . . . Person who purchases property for another to conceal identity of real purchaser, or to accomplish some purpose otherwise not allowed." (Internal quotation marks omitted.) Black's Law Dictionary (6th Ed. 1990).

[6] Specifically, in a decision dated June 19, 2001, the court stated: "The Amster defendants, led by Bruce D. Amster, have systematically conspired to defraud the judgment creditor Kendall, and have contumaciously flouted the court's injunctive and receivership orders: they have dissipated funds to friends and relatives in violation of this court's orders; they have incorporated a straw company for the purpose of transferring the assets and good will of Hyannis Auto Restorations, Inc.; they opened up a secret bank account and deposited $100,000 to that account, unlawfully circumventing the court's receivership order; and they have willfully withheld documents from the court's receiver. All these acts were designed by Bruce D. Amster to hinder, delay and defeat the judgment creditor from assets he was entitled to lawfully levy upon."

to Jenkins as required by the receivership order. At some point, Colton Amster incorporated Red Line, and Bruce Amster worked there five to six hours per day. The court expressly found that Red Line "is a continuation of the business that Bruce Amster conducted through Hyannis Restorations, which consists in restoring rare, very expensive, vintage automobiles . . . ." The court further found that Bruce Amster diverted his customers from Hyannis Restorations and directed them to Red Line. Several of his former customers tendered payments to Bruce Amster, who then turned them over Colton Amster. The receiver was not made aware of these payments.

On November 22, 2004, the plaintiffs filed an ex parte application for a prejudgment remedy to secure the assets of Bruce Amster, Colton Amster and Red Line.[7] The complaint attached to the application alleged violations of the Uniform Fraudulent Transfer Act, General Statutes § 52-552a et seq., common-law fraud, aiding and abetting common-law fraud and violations of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq. The court granted the application. The defendants subsequently moved to dissolve or to modify the prejudgment remedy. A hearing on the attachment was held on December 13 and 20, 2004. Following the hearing, the court issued a memorandum of decision and concluded that "there is probable cause that judgment will be rendered in favor of the plaintiffs, and the prejudgment remedy previously granted shall remain in effect." This appeal followed.[8]

Pursuant to a motion for articulation filed by the defendants, the court, on October 27, 2006, modified its previous order. The court declined to articulate its

[7] See General Statutes § 52-278e.

[8] Pursuant to General Statutes § 52-278l (a), the granting of a prejudgment remedy is a final judgment for purposes of appeal. See Marlin Broadcasting, LLC v. Law Office of Kent Avery, LLC, 101 Conn. App. 638, 641 n.1, 922 A.2d 1131 (2007).

order with respect to Bruce Amster or Red Line. With respect to Colton Amster, the court decreased the amount of the prejudgment attachment to $650,000.

As a preliminary matter, it will be helpful to set forth the following legal principles that will aid in the resolution of the defendants' appeal. "In Connecticut, a prejudgment attachment is a provisional remedy afforded to a claimant to secure satisfaction of a judgment in the future." *Shawmut Bank* v. *Brooks Development Corp.*, 46 Conn. App. 399, 410, 699 A.2d 283 (1997). This type of remedy "is unknown to the common law and is founded on and regulated by our statutory law." *Ledgebrook Condominium Assn., Inc.* v. *Lusk Corp.*, 172 Conn. 577, 582, 376 A.2d 60 (1977); see also General Statutes §§ 52-278a to 52-278n. Further, we note that "[t]he adjudication made by the court on [an] application for a prejudgment remedy is not part of the proceedings ultimately to decide the validity and merits of the plaintiff's cause of action. It is independent of and collateral thereto . . . ." (Internal quotation marks omitted.) *Marlin Broadcasting* v. *Law Office of Kent Avery*, 101 Conn. App. 638, 647, 922 A.2d 1131 (2007).

Our Supreme Court recently stated: "A prejudgment remedy means any remedy or combination of remedies that enables a person by way of attachment . . . to deprive the defendant in a civil action of, or affect the use, possession or enjoyment by such defendant of, his property prior to final judgment . . . . A prejudgment remedy is available upon a finding by the court that there is probable cause that a judgment in the amount of the prejudgment remedy sought, or in an amount greater than the amount of the prejudgment remedy sought, taking into account any defenses, counterclaims or set-offs, will be rendered in the matter in favor of the plaintiff . . . . Proof of probable cause as a condition of obtaining a prejudgment remedy is not as demanding as proof by a fair preponderance of the

evidence. . . . The legal idea of probable cause is a bona fide belief in the existence of the facts essential under the law for the action and such as would warrant a man of ordinary caution, prudence and judgment, under the circumstances, in entertaining it. . . . Probable cause is a flexible common sense standard. It does not demand that a belief be correct or more likely true than false. . . . Under this standard, the trial court's function is to determine whether there is probable cause to believe that a judgment will be rendered in favor of the plaintiff in a trial on the merits. . . .

"As for our standard of review, we have stated: This court's role on review of the granting of a prejudgment remedy is very circumscribed. . . . In its determination of probable cause, the trial court is vested with broad discretion which is not to be overruled in the absence of clear error. . . . [W]e have consistently enunciated our standard of review in these matters. In the absence of clear error, this court should not overrule the thoughtful decision of the trial court, which has had an opportunity to assess the legal issues which may be raised and to weigh the credibility of at least some of the witnesses. . . . [On appeal], therefore, we need only decide whether the trial court's conclusions were reasonable under the clear error standard." (Citations omitted; internal quotation marks omitted.) *TES Franchising, LLC* v. *Feldman*, 286 Conn. 132, 136–38, 943 A.2d 406 (2008); *Benton* v. *Simpson*, 78 Conn. App. 746, 750–52, 829 A.2d 68 (2003); see also *Doe* v. *Rapoport*, 80 Conn. App. 111, 116, 833 A.2d 926 (2003) (appellate court entitled to presume trial court acted properly and considered all evidence). With these principles in mind, we turn to the defendants' specific claims.

I

The defendants first claim that the court improperly found that there was probable cause to grant the prejudgment remedy. Specifically, they argue that the plaintiffs failed to establish the elements of a violation of

the Uniform Fraudulent Transfer Act;[9] that is, that the customer payments endorsed over to Colton Amster were the assets of Bruce Amster, that the transfers were intended to hinder or to delay Kendall, or that the transfers were made without consideration or less than a return of fair value. We are not persuaded that the court's finding of probable cause constituted clear error.

In their appellate brief, the defendants assert that "[r]educed to their most elemental terms, the factual allegations of the complaint sound in fraud under . . . § 52-552e (a) (1)." The defendants' argument, however, fails to account for the CUTPA claim set forth in the plaintiffs' complaint. We note that the court, in denying the defendants' motion to dissolve or to modify the prejudgment remedy, expressly stated that *"the plaintiffs . . . have demonstrated probable cause that judgment will enter against the defendants for violations of the Connecticut Unfair Trade Practices Act, General Statutes § 42-110a et seq."* (Emphasis added.)

Additionally, we note that the plaintiffs alleged, as part of their CUTPA cause of action, that Red Line was created as a successor corporation to the Massachusetts corporate entities that previously had been controlled by Bruce Amster. They further alleged that the "assets and good will" of Hyannis Restorations had been transferred to Red Line to avoid detection by and

---

[9] General Statutes § 52-552e (a) provides: "A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, if the creditor's claim arose before the transfer was made or the obligation was incurred and if the debtor made the transfer or incurred the obligation: (1) With actual intent to hinder, delay or defraud any creditor of the debtor; or (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor (A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction, or (B) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due."

payment to the plaintiffs. The plaintiffs also maintained that substantial sums of money were withdrawn from the bank accounts of both Colton Amster and Red Line on behalf of Bruce Amster. Such moneys should have been turned over to Jenkins. Finally, as a result of this diversion from Hyannis Restorations to the successor corporation in Connecticut, Jenkins was forced to wind up the affairs of the Massachusetts businesses and to liquidate their assets.

"CUTPA, by its own terms, applies to a broad spectrum of commercial activity. The operative provision of the act . . . states merely that [n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce. Trade or commerce, in turn, is broadly defined as the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value in this state. . . . The entire act is remedial in character . . . and must be liberally construed in favor of those whom the legislature intended to benefit." (Citations omitted; internal quotation marks omitted.) *Willow Springs Condominium Assn., Inc.* v. *Seventh BRT Development Corp.*, 245 Conn. 1, 42, 717 A.2d 77 (1998); see also *Ostrowski* v. *Avery*, 243 Conn. 355, 378–79, 703 A.2d 117 (1997).

Whether a practice is unfair and constitutes a violation of CUTPA is a question of fact. See *Scrivani* v. *Vallombroso*, 99 Conn. App. 645, 650, 916 A.2d 827, cert. denied, 282 Conn. 904, 920 A.2d 309, aff'd after remand, 102 Conn. 668, 927 A.2d 920 (2007). Our Supreme Court has explained that "[i]t is well settled that in determining whether a practice violates CUTPA we have adopted the criteria set out in the cigarette rule by the federal trade commission for determining when a practice is unfair: (1) [W]hether the practice, without necessarily

having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers, [competitors or other businesspersons]. . . . All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three. . . . Thus a violation of CUTPA may be established by showing either an actual deceptive practice . . . or a practice amounting to a violation of public policy. . . . In order to enforce this prohibition, CUTPA provides a private cause of action to [a]ny person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a [prohibited] method, act or practice . . . ." (Citations omitted; internal quotation marks omitted.) *Ramirez* v. *Health Net of the Northeast, Inc.*, 285 Conn. 1, 19, 938 A.2d 576 (2008). We conclude that there was ample evidence before it for the court to conclude that there was probable cause that the defendants, by way of ignoring the receivership order and transferring assets and good will from Hyannis Restorations to Red Line, have violated CUTPA and that judgment will be rendered in favor of the plaintiffs with respect to that cause of action.

The court found probable cause that the judgment will be rendered in favor of the plaintiffs with respect to the CUTPA claim. The defendants, however, focused their attack on the counts alleging that the Uniform Fraudulent Transfer Act has been violated. We conclude that the court's determination regarding the CUTPA count was proper and that the defendants have failed to demonstrate that it was clear error for the court to

grant the plaintiffs' application for a prejudgment remedy.

## II

The defendants next claim that the court improperly issued a prejudgment remedy attaching $5.6 million of Red Line's property or assets and $650,000 of Colton Amster's property or assets. Specifically, they argue that "the magnitude of the prejudgment remedies issued against Colton Amster and Red Line cannot be logically justified by the underlying financial transactions upon which they were based." We conclude that the court's decision was not clear error, and, therefore, we decline to disturb it.

## A

We first address the prejudgment remedy as applied to Red Line. In their proposed complaint, the plaintiffs set forth the following allegation: "In further execution of their scheme to defraud [the plaintiffs], Bruce Amster and Colton [Amster] formed Red Line . . . on October 23, 2003. On information and belief, from its inception Red Line's business was identical to the business of Hyannis Restorations and the other corporate entities through which Bruce Amster operated his vintage car business prior to the Receivership Order. Accordingly, all proceeds thereafter received by Red Line were required by law to be turned over to [Jenkins]. However, at no time have any such funds been transferred to [Jenkins]. Instead, payments to Red Line were routinely deposited into an account that Colton [Amster] opened in Red Line's name at the same branch of the . . . [b]ank at which [Colton Amster's] account was held."

After considering the prejudgment remedy application, the court ordered that the property and assets of Red Line be attached and secured in the amount of $5.6 million. After hearing the evidence over the course of

the two day hearing, the court found that neither Bruce Amster nor Colton Amster was credible. It further found that Bruce Amster had diverted customers from his prior Massachusetts business to the new business in Connecticut and that payments were diverted to Colton Amster without notifying Jenkins. The court then made a specific finding regarding Red Line, concluding that it was "a continuation of the business that Bruce Amster conducted through Hyannis Restorations, which consists in restoring rare, very expensive, vintage automobiles, and Bruce Amster has worked at Red Line approximately five to six hours a day." Finally, it noted that although Red Line had a checking account, the company paid its employees' salaries and for its supplies and parts in cash, and that this was indicative of an "attempt at deception . . . ." Further, this practice was identical to what had occurred with Hyannisport Restorations and what the Massachusetts court described as "an illegitimate business practice that . . . was adopted to skim cash out of [the business] to benefit [Bruce Amster]."

"Facts enabling the court to establish the amount of damages involved must be alleged in . . . an affidavit." *Essex Group, Inc.* v. *Ducci Electric Co.*, 181 Conn. 524, 525, 436 A.2d 16 (1980); see also *Mullai* v. *Mullai*, 1 Conn. App. 93, 94, 468 A.2d 1240 (1983) (plaintiff must establish probable amount of damages involved). We have stated that the amount of damages in an application for a prejudgment remedy need not be determined with mathematical precision. *Rafferty* v. *Noto Bros. Construction, LLC*, 68 Conn. App 685, 693, 795 A.2d 1274 (2002). "A fair and reasonable estimate of the likely potential damages is sufficient to support the entry of a prejudgment attachment. . . . Nevertheless, the plaintiff bears the burden of presenting evidence which affords a reasonable basis for measuring [its] loss." (Citation omitted; internal quotation marks omitted.) Id.

The court found that Red Line was a continuation of Hyannis Restorations controlled by Bruce Amster. Red Line was in the same business, restoring rare, expensive, vintage automobiles; used the same personnel, namely, Bruce Amster and Colton Amster; and had the same customers. *"The mere transfer of the assets of one corporation to another corporation or individual generally does not make the latter liable for the debts or liabilities of the first corporation except where* the purchaser expressly or impliedly agrees to assume the obligations, *the purchaser is merely a continuation of the selling corporation . . . or the transaction is entered into fraudulently to escape liability. . . .* Under the continuity of enterprise theory, [successor liability attaches where] the successor maintains the same business, with the same employees doing the same jobs, under the same supervisors, working conditions, and production processes, and produces the same products for the same customers." (Citations omitted; emphasis added; internal quotation marks omitted.) *Chamlink Corp.* v. *Merritt Extruder Corp.*, 96 Conn. App. 183, 187–88, 899 A.2d 90 (2006).

There was evidence that the combined total of damages, statutory interest, attorney's fees and costs owed by Bruce Amster and Hyannis Restorations to Kendall totaled approximately $5.5 million. On the basis of the finding that Red Line was nothing more than a continuation of Hyannis Restorations, and thus subject to successor liability, we cannot say that it was clear error for the court to order a prejudgment remedy in the form of an attachment in the amount of $5.6 million against Red Line.

B

We next address the prejudgment remedy as applied to Colton Amster. Following the defendants' motion for articulation, the court vacated its earlier decision as to

the amount attached with respect to Colton Amster, approximately $5.6 million, and reduced it to $650,000. We conclude that it was not clear error for the court to order the attachment in that amount.

1

Before reaching the merits of Colton Amster's claim, we must address the argument offered by the plaintiffs. They claim, as an alternate basis for disposing of the appeal as to Colton Amster, that we should dismiss this portion of the appeal for lack of subject matter jurisdiction on the ground that the appeal is moot.[10] Specifically, the plaintiffs contend that because the order that the appeal challenges is no longer in existence, there is no actual controversy and thus the appeal from that order is now moot. Due to the specific facts and circumstances of the present case, we conclude that the claim as to Colton Amster is not moot.

At the outset, we set forth the standard of review applicable to the plaintiffs' claim. We begin with the well settled general rule that "the existence of an actual controversy is an essential requisite to appellate jurisdiction. . . . When, during the pendency of an appeal, events have occurred that preclude an appellate court from granting any practical relief through its disposition of the merits, a case has become moot. . . . Mootness implicates this court's subject matter jurisdiction, raising a question of law over which we exercise plenary review." (Internal quotation marks omitted.) *Windels* v. *Environmental Protection Commission*, 284 Conn. 268, 279, 933 A.2d 256 (2007).

In response to the defendants' motion for articulation, the court altered its prior order with respect to

[10] Because the plaintiffs' argument concerns subject matter jurisdiction, it is a threshold matter requiring resolution. See *Kondrat* v. *Brookfield*, 97 Conn. App. 31, 37, 902 A.2d 718, cert. denied, 280 Conn. 926, 908 A.2d 1087 (2006).

the amount of the attachment as to Colton Amster. As noted, the court initially had authorized an attachment of the property or assets of Bruce Amster, Colton Amster or Red Line in the aggregate amount securing $5.6 million. It subsequently altered those terms, leaving the $5.6 million attachment, unapportioned as to Bruce Amster and Red Line, and authorized an attachment of the property or assets of Colton Amster in the amount of $650,000. Our case law establishes that any substantive modification of a judgment constitutes an opening of the judgment. See *Commissioner of Transportation* v. *Rocky Mountain, LLC*, 277 Conn. 696, 705, 894 A.2d 259 (2006). Because the court reduced the amount of the attachment as to Colton Amster by approximately $5 million, we conclude that the original judgment was modified substantively, and, accordingly, the judgment was opened.[11]

We now address the effect of the court's opening of the judgment on the pending appeal. We turn to our Supreme Court's decision in *RAL Management, Inc.* v. *Valley View Associates*, 278 Conn. 672, 899 A.2d 586 (2006), for guidance. In that case, the court stated: "In considering the effect of the opening of a judgment on a pending appeal . . . the appropriate question is whether the change to the judgment has affected the issue on appeal. If, in opening the judgment, the trial court reverses itself and resolves the matter at issue on appeal in the appellant's favor, it is clear that the appeal is moot as there is no further practical relief that may be afforded. . . . Conversely, if the judgment is opened to address issues entirely unrelated to the appeal, the opening of the judgment has had no effect on the availability of relief. A more difficult question may be presented if the trial court addresses the matter at issue on appeal, but does not entirely afford the

---

[11] It is clear, however, that the defendants filed their appeal challenging the initial order of attachment. See General Statutes § 52-278*l*.

appellant the relief sought. In such cases, the extent to which the trial court alters the judgment may require either a new appeal or an amended appeal. See Practice Book §§ 61-9 and 63-1 (c) (3). As [t]he determination of whether a claim has become moot is fact sensitive . . . the facts of each case similarly must dictate the appropriate procedure to follow." (Citations omitted; internal quotation marks omitted.) *RAL Management, Inc.* v. *Valley View Associates,* supra, 691–92.

The present case falls within the third scenario. In other words, the court altered its judgment as to a matter at issue on appeal, namely, the amount of the attachment as to Colton Amster, but did not entirely afford the relief sought. Although the better procedure may have been for the defendants to file an amended appeal form; see Practice Book § 61-9; we conclude, under the specific facts and circumstances of this case, that the appeal has not been rendered moot. Colton Amster has not been granted full relief as to his claim that the attachment amount was too high. An actual controversy between the parties remains, and we are not precluded from granting practical relief to Colton Amster. Accordingly, we reject the plaintiffs' argument that this claim is moot, and we proceed to the merits of his claim.

2

We now address the prejudgment remedy as applied to Colton Amster. He argues that the evidence adduced during the prejudgment remedy hearing demonstrates that, at most, his liability would be $322,419 and not the $650,000 as found by the court. We conclude that it was not clear error for the court to issue an attachment in the amount of $650,000 as to Colton Amster.

The court stated that the plaintiffs demonstrated damages as follows. First, Bruce Amster fraudulently turned over his salary from Pray in the amount of $70,000. Neither of the plaintiffs was aware of these

transactions, which were completed with the assistance and knowledge of Colton Amster. Second, prior to the formation of Red Line, Colton Amster assisted Bruce Amster in concealing payments of former customers totaling approximately $251,156. Third, Colton Amster assisted in the concealment of $322,238 in payments to Red Line from former customers of Hyannis Restorations. The total of these transactions is approximately $650,000.

We have reviewed the entire record, including the affidavit of Jenkins that was included with the attachment application. The plaintiffs have provided a reasonable basis that supports an attachment of $650,000, Moreover, this amount finds further support in light of the court's finding of probable cause that the actions of Colton Amster violated CUTPA by assisting the fraudulent concealment of money from the plaintiffs. Given our limited scope of review, and the fact that damages in an application for a prejudgment remedy need not be determined with mathematical precision, we cannot conclude that the decision of the court to order an attachment in the amount of $650,000 as to Colton Amster constituted clear error.

The judgment is affirmed.

In this opinion the other judges concurred.