ANTHONY H. SALCE, SR. *v.* WALTER WOLCZEK
(AC 33624)

Beach, Sheldon and Borden, Js.

Argued September 13, 2012—officially released March 26, 2013

*Laura Pascale Zaino*, with whom, on the brief, were *John B. Farley* and *Dan E. LaBelle*, for the appellant (defendant).

*Jeffrey J. White*, with whom was *Benjamin C. Jensen*, for the appellee (plaintiff).

### Opinion

BEACH, J. In this breach of contract action, the defendant, Walter Wolczek, appeals from the judgment of the trial court rendered in favor of the plaintiff, Anthony H. Salce, Sr. The defendant claims the court erred in (1) granting the plaintiff's motion for summary judgment on the breach of contract count of the complaint, (2) awarding $1 million in damages for breach of contract and (3) awarding 8 percent postjudgment interest. We affirm the judgment of the trial court.

The parties stipulated to the following facts. Prior to April 13, 2007, the plaintiff and the defendant each owned a 50 percent interest in Anwalt, LLC (Anwalt).

In 2007, Anwalt owned real property located at 2 Corporate Drive in Trumbull (premises). On April 13, 2007, the plaintiff and the defendant entered into a written agreement pursuant to which the plaintiff agreed to sell his 50 percent interest in Anwalt to the defendant for $1.75 million (buyout agreement).

The buyout agreement provided, in clause 2 (b) (contingency clause), in relevant part: "<u>Contingent Addition to Purchase Price</u>. If within one year of the closing hereunder *any ownership interest* in the Premises . . . *is transferred* to a 'Non-Wolczek Person' based on a whole property value of more than $3,500,000, Buyer [defendant] shall pay to Seller [plaintiff] an additional purchase price equal to one-half the excess at the same time as the transfer. The 'excess' is the amount by which the whole property value for the transfer exceeds $3,500,000. The 'whole value' for any sale is the 100% value on which any percentage interest being transferred is based. For example, a one-quarter interest transferred for $1,000,000 would equate to a whole property value of $4,000,000. A 'Non-Wolczek Person' is someone other than Walter Wolczek or his immediate family member or lineal descendant." (Emphasis added.)

The parties closed on the sale of the plaintiff's interest in Anwalt pursuant to the buyout agreement on May 31, 2007. Subsequently, Anwalt conveyed the premises to Corporate Drive Office Center, LLC (Corporate Drive), an entity comprising family members of the defendant.[1] On March 19, 2008, within one year of the closing of the buyout agreement, Corporate Drive entered into a real property purchase agreement with Brian Vaughn (Vaughn purchase agreement) to sell the premises for $5.5 million to Vaughn or an entity designated by him. The Vaughn purchase agreement was

---

[1] The plaintiff does not claim that this transfer was to a "Non-Wolczek Person" or that it triggered the contingency clause.

executed by the defendant in his capacity as a member of Corporate Drive. Vaughn organized and designated an entity known as Corporate Drive, LLC, to take title to the premises. Neither Vaughn nor Corporate Drive, LLC is an immediate family member or lineal descendant of the defendant. On July 1, 2008, more than one year from the date of the closing of the buyout agreement, the closing of the Vaughn purchase agreement for the sale of the premises took place.

The plaintiff brought a seven count complaint against the defendant to recover damages for the defendant's alleged breach of the buyout agreement.[2] The plaintiff moved for summary judgment on the first count of the complaint, which alleged breach of contract. He argued that he was entitled to summary judgment on count one because an ownership interest was transferred within one year of the execution of the buyout agreement; that is, equitable ownership of the premises was transferred by the Vaughn purchase agreement. The court, *Dooley, J.*, granted the motion for summary judgment as to count one. The court concluded that, on the basis of the doctrine of equitable conversion, there unambiguously was a transfer of equitable title to Vaughn on March 19, 2008, that this was a transfer of an ownership interest, and that, therefore, the contingency clause unambiguously required the additional payment.

The plaintiff then withdrew the remaining six counts of the complaint; see footnote 2 of this opinion; and moved for final judgment on the first count, requesting damages of $1 million, prejudgment interest, attorney's fees, offer of compromise interest, costs and postjudgment interest. The court granted the motion and rendered judgment for the plaintiff as follows: damages

---

[2] Although the plaintiff's complaint was in seven counts, only the first count alleging breach of contract is at issue in this appeal. Furthermore, although the defendant filed a counterclaim, that also is not at issue in this appeal.

for breach of contract in the amount of $1 million; attorney's fees in the amount of $98,718.20; offer of compromise interest at the rate of 8 percent per year in the amount of $264,172.69; and costs in the amount of $1140.83; for a total judgment of $1,364,026.20, plus postjudgment interest to accrue at the rate of 8 percent per year. This appeal followed.

I

The defendant first claims that the court improperly determined that the contingency clause was unambiguous and, therefore, that the court improperly rendered summary judgment on count one of the complaint. We do not agree.

"Where the language of the [writing] is clear and unambiguous, the [writing] is to be given effect according to its terms. A court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity . . . . Similarly, any ambiguity in a [written instrument] must emanate from the language used in the [writing] rather than from one party's subjective perception of the terms. . . . If a contract is unambiguous within its four corners, the determination of what the parties intended by their contractual commitments is a question of law." (Citation omitted; internal quotation marks omitted.) *Murtha* v. *Hartford*, 303 Conn. 1, 7–8, 35 A.3d 177 (2011).

The contingency clause provided that if, within one year from May 31, 2007, "*any ownership interest* in the Premises . . . *is transferred* to a 'Non-Wolczek Person' based on a whole property value of more than $3,500,000, Buyer [defendant] shall pay to Seller [plaintiff] an additional purchase price. . . ." (Emphasis added.) By its plain terms, the buyout agreement made clear that the transfer of "any ownership interest" to a requisite person for at least a certain minimum amount triggered the contingency clause. It is uncontested that,

on March 19, 2008, within the one year deadline under the buyout agreement, the defendant entered into the Vaughn purchase agreement.

The Vaughn purchase agreement unambiguously accomplished a transfer of an ownership interest, despite the fact that physical passing of title was to be accomplished later. As stated by our Supreme Court in *Francis T. Zappone Co.* v. *Mark*, 197 Conn. 264, 267 497 A.2d 32 (1985) (*Zappone*): "Under the doctrine of equitable conversion . . . the purchaser of land under an executory contract is regarded as the owner, subject to the vendor's lien for the unpaid purchase price, and the vendor holds the legal title in trust for the purchaser. . . . The vendor's interest thereafter in equity is in the unpaid purchase price, and is treated as personalty . . . while the purchaser's interest is in the land and is treated as realty." (Citations omitted; internal quotation marks omitted.) Id.

*Zappone* resolved a factual situation in which a real estate broker, having properly brought together a buyer and a seller of real estate, sought its commission. The buyer and seller had contractually agreed to a sale and a "bond for deed" had been executed, whereby the seller would transfer to the buyer a warranty deed when the buyer had fully performed the terms of the agreement. Title apparently never was physically transferred. Id., 265–66. The defendant claimed that no commission was due because title had not passed; the listing agreement had stated that the commission was due "upon the sale, exchange or transfer, or upon the exercise of any option to purchase" the property. (Internal quotation marks omitted.) Id., 268. Our Supreme Court disagreed, holding that "[a] binding sales agreement such as a valid bond for deed passes equitable title, under the doctrine of equitable conversion, upon its execution. . . . *The parties are bound from that instant and the formal transfer of 'paper' title can*

*occur at some future date.*" (Citation omitted; emphasis added.) Id.

The defendant in the present case argues that the language is ambiguous because, inter alia, a "transfer" of an ownership interest might ordinarily be associated with the passing of title at a closing and the additional funds may not ordinarily be available until the time of closing. But the Vaughn purchase agreement necessarily transferred an ownership *interest* independent of physical title; see id.; see also *New England Yacht Sales, Inc.* v. *Commissioner of Revenue Services,* 198 Conn. 624, 625–36, 504 A.2d 506 (1986); and, in any event, the buyout agreement was drafted by lawyers, who are deemed to be aware of the meanings of "transfer" and "any ownership interest." See Restatement 2d, Contracts § 202 (3) (b). Had the drafters intended "transfer of title at closing" to be the triggering event, they could have said so; the chosen phrase, "any ownership interest," is broad and sweeping. Finally, the additional amount is not due as a share of the proceeds of the subsequent sale; rather, it is an adjustment of the buyout price that was triggered by a recognition by the defendant of a market value of the premises greater than $3.5 million within one year of the buyout. It, thus, is not logically dependent on the actual receipt of additional proceeds.

## II

The defendant next claims that the court erred in awarding $1 million in damages. The court arrived at the $1 million award by "taking [50 percent] of the difference between the [$3.5 million] and the re-sale price to Brian Vaughn, [$5.5 million]." The defendant does not contest the formula for calculating damages as found in the contingency clause of the buyout agreement, which provided that if any ownership interest was transferred to a non-Wolczek person within one

year "based on a whole property value of more than $3,500,000, Buyer [defendant] shall pay to Seller [plaintiff] an additional purchase price equal to one-half the excess at the same time as the transfer. The 'excess' is the amount by which the whole property value for the transfer exceeds $3,500,000. . . ." The defendant argues that the court's using $5.5 million as the purchase price was improper because as of March 19, 2008, the defendant "had not sold anything to . . . Vaughn. Rather, there was a contract for sale under which $550,000 in deposit money had changed hands, but a very real risk remained, as exists with any contract for the sale of property, that the sale might not close."

Although the defendant's argument is phrased in terms of damages, it is, essentially, an argument that he did not breach the buyout agreement and trigger the contingency clause. As we held previously in this opinion, an ownership interest was transferred to Vaughn on March 19, 2008. The court applied the language of the contingency clause properly to calculate damages at $1 million. Although the full $5.5 million did not transfer hands on March 19, 2008, the defendant and Vaughn signed an agreement on that date thereby entering into a commitment to perform the sale for the price of $5.5 million. The court properly held that an additional $1 million, one-half of the amount of the purchase price exceeding $3.5 million, was owed to the plaintiff at that time.

### III

The defendant finally claims that the court erred in awarding 8 percent postjudgment interest. We disagree.

In his motion for judgment, the plaintiff requested, inter alia, postjudgment interest at a rate of 10 percent per annum. In its memorandum of decision on the motion for judgment, the court determined that it had no evidence before it that the defendant withheld the

funds in bad faith. The court, however, noted that it is not required to find bad faith in order to determine that the detention of the money was wrongful. The court stated that since the date of the closing on the sale to Vaughn, the defendant had the benefit of $1 million that he should have paid to the plaintiff.[3] The court awarded postjudgment interest at an annual rate of 8 percent.

A trial court's decision to award postjudgment interest is subject to review for an abuse of discretion. *Bower* v. *D'Onfro*, 45 Conn. App. 543, 551, 696 A.2d 1285 (1997). General Statutes § 37-3a (a) provides in relevant part: "Except as provided in sections 37-3b, 37-3c and 52-192a, interest at the rate of ten per cent a year, and no more, may be recovered and allowed in civil actions or arbitration proceedings under chapter 909, including actions to recover money loaned at a greater rate, as damages for the detention of money after it becomes payable. . . ." "Because § 37-3a provides that interest may be recovered . . . it is clear that the statute does not require an award of interest in every case in which money has been detained after it has become payable. Rather, an award of interest is discretionary." (Internal quotation marks omitted.) *Sosin* v. *Sosin*, 300 Conn. 205, 228, 14 A.3d 307 (2011).

The defendant argues that the award of postjudgment interest was improper because the court declined to award prejudgment interest based on the same considerations and it had determined that the defendant pursued his defense in good faith. First, the defendant points to no Connecticut case law, and we are aware of none, that provides that a court cannot both award postjudgment interest and deny prejudgment interest. Second, although the court found that defendant pursued his defense in good faith, that is not inconsistent

---

[3] The court did not award prejudgment interest attributable to the period of time between the breach and the judgment.

with a finding that the defendant had wrongfully withheld the money. "Although bad faith is one factor that the court may look at when deciding whether to award interest under § 37-3a . . . in the context of the statute, wrongful is not synonymous with bad faith conduct. Rather, wrongful means simply that the act is performed without the legal right to do so. . . . [This is] consistent with the primary purpose of § 37-3a, which is not to punish persons who have detained money owed to others in bad faith but, rather, to compensate parties that have been deprived of the use of their money." (Citation omitted; internal quotation marks omitted.) Id., 229–30. The court acted within its discretion in awarding an 8 percent postjudgment interest rate.[4]

The judgment is affirmed.

In this opinion SHELDON, J., concurred.

BORDEN, J., dissenting. I disagree with the majority that the contractual clause in question is unambiguous. I conclude, to the contrary, that it is ambiguous. I would, therefore, reverse the summary judgment of the trial court in the plaintiff's favor.

As the majority indicates, the parties stipulated to the following facts. Prior to April 13, 2007, the plaintiff, Anthony H. Salce, Sr., and the defendant, Walter Wolczek, each owned a 50 percent interest in Anwalt, LLC (Anwalt). As of May 30, 2007, Anwalt owned real property located at 2 Corporate Drive in Trumbull (premises). On or about April 13, 2007, the plaintiff and the defendant entered into a written buyout agreement pursuant to which the plaintiff agreed to sell his 50 percent

---

[4] The defendant also argues that 8 percent was excessive, and references lower interest rates. The court was not bound to apply these lower interest rates, and was within its discretion in awarding 8 percent, which was lower than the statutory maximum of ten percent. See General Statutes § 37-3a.

interest in Anwalt to the defendant for $1.75 million (buyout agreement).

The contingency clause, clause 2 (b) of the buyout agreement, provided in relevant part: "Contingent Addition to Purchase Price. If within one year of the closing hereunder *any ownership interest* in the Premises . . . *is transferred* to a 'Non-Wolczek Person' *based on a whole property value of more than $3,500,000*, Buyer [defendant] shall pay to Seller [plaintiff] an additional purchase price equal to one-half the excess *at the same time as the transfer*. The 'excess' is the amount by which the whole property value for the transfer exceeds $3,500,000. The 'whole value' for any sale is the 100% value on which any percentage interest being transferred is based. For example, a one-quarter interest transferred for $1,000,000 would equate to a whole property value of $4,000,000. A 'Non-Wolczek Person' is someone other than Walter Wolczek or his immediate family member or lineal descendant." (Emphasis added.)

The parties closed on the sale of the plaintiff's interest in Anwalt on May 31, 2007. Subsequently, Anwalt conveyed the premises to Corporate Drive Office Center, LLC (Corporate Drive), an entity comprised of family members of the defendant.[1]

On March 19, 2008, within one year of the closing of the buyout agreement, Corporate Drive entered into a real property purchase agreement with Brian Vaughn (Vaughn purchase agreement) to sell the premises for $5.5 million to Vaughn or an entity designated by him. The Vaughn purchase agreement was executed by the defendant in his capacity as a member of Corporate Drive. Vaughn organized and designated an entity known as Corporate Drive, LLC, to take title to the

---

[1] The plaintiff does not claim that this transfer was to a "Non-Wolczek Person" or that it triggered the contingency clause.

premises. Neither Vaughn nor Corporate Drive, LLC is an immediate family member or lineal descendant of the defendant. On July 1, 2008, more than one year from the date of the closing of the buyout agreement, the closing of the Vaughn purchase agreement for the sale of the premises took place.

In addition to these stipulated facts, the defendant asserts, and the plaintiff does not dispute, that the contract language in question was drawn by the plaintiff. Furthermore, the plaintiff asserts, and the defendant does not dispute, that both parties are commercially sophisticated and were represented by counsel.

Thus, the issue on appeal centers on the language of the contingency clause providing that if, within one year from May 31, 2007, *"any ownership interest* in the Premises . . . *is transferred* to a 'Non-Wolczek Person' *based on a whole property value of more than $3,500,000,* Buyer [defendant] shall pay to Seller [plaintiff] *an additional purchase price equal to one-half the excess at the same time as the transfer.* The 'excess' is the amount by which the whole property value for the transfer exceeds $3,500,000. *The 'whole value' for any sale is the 100% value on which any percentage interest being transferred is based. For example, a one-quarter interest transferred for $1,000,000 would equate to a whole property value of $4,000,000."* (Emphasis added.) If, as the plaintiff contends and the majority concludes, that language unambiguously includes the entry by the defendant into the Vaughn purchase agreement on March 19, 2008—less than one year from the date of the closing of the buyout agreement—the plaintiff was entitled to summary judgment. If, however, as the defendant contends and I conclude, that language is susceptible to an alternative reasonable interpretation, namely, that the language in question refers to the actual closing of the Vaughn purchase agreement on July 1, 2008—more than one

year from the date of the buyout agreement—the plaintiff was not entitled to summary judgment.[2]

The majority concludes that, on the basis of the doctrine of equitable conversion; see *Francis T. Zappone Co.* v. *Mark*, 197 Conn. 264, 268, 497 A.2d 32 (1985) ("A binding [real estate] sales agreement . . . passes equitable title, under the doctrine of equitable conversion, upon its execution . . . . The parties are bound from that instant and the formal transfer of 'paper' title can occur at some future date." [Citation omitted.]); there was a transfer of equitable title to Vaughn on March 19, 2008; that this accomplished a transfer of an ownership interest; and that, therefore, the contingency clause unambiguously included the entry into the Vaughn purchase agreement. If, however, there is any ambiguity—as that term is defined in our law—as to whether the buyout agreement language includes the entry into the Vaughn purchase agreement, the plaintiff was not entitled to summary judgment. That is because of the court's function in interpreting a contract.

The question of contract interpretation involves a question of the intent of the parties, which ordinarily presents a question of fact for the ultimate fact-finder. *Tallmadge Bros., Inc.* v. *Iroquois Gas Transmission System, L.P.*, 252 Conn. 479, 495, 746 A.2d 1277 (2000). Where, however, the language of the contract is unambiguous, its interpretation presents a question of law for the court. Id. Furthermore, whether the language is ambiguous is itself a question of law, upon which our review on appeal is de novo. *United Illuminating Co.* v. *Wisvest–Connecticut, LLC*, 259 Conn. 665, 669–70, 791 A.2d 546 (2002).

---

[2] Because the summary judgment was litigated and based solely on the language of the contract in question, it did not involve, and this appeal does not involve, the legal consequences, if any, of any claim by the plaintiff that the defendant intentionally structured the timing of the closing of the Vaughn purchase agreement to avoid the one year deadline.

"In determining whether a contract is ambiguous, the words of the contract must be given their natural and ordinary meaning. *Kelly* v. *Figueiredo*, 223 Conn. 31, 35, 610 A.2d 1296 (1992). A contract is unambiguous when its language is clear and conveys a definite and precise intent. *Levine* v. *Massey*, 232 Conn. 272, 278, 654 A.2d 737 (1995). The court will not torture words to impart ambiguity where ordinary meaning leaves no room for ambiguity. . . . Id., 279. Moreover, the mere fact that the parties advance different interpretations of the language in question does not necessitate a conclusion that the language is ambiguous. . . . *Stephan* v. *Pennsylvania General Ins. Co.*, 224 Conn. 758, 764, 621 A.2d 258 (1993). Furthermore, a presumption that the language used is definitive arises when, as in the present case, the contract at issue is between sophisticated parties and is commercial in nature. *Tallmadge Bros., Inc.* v. *Iroquois Gas Transmission System, L.P.* [supra, 252 Conn. 494–97]." (Internal quotation marks omitted.) Id., 670.

"In contrast, a contract is ambiguous if the intent of the parties is not clear and certain from the language of the contract itself. . . . [A]ny ambiguity in a contract must emanate from the language used by the parties. . . . The contract must be viewed in its entirety, with each provision read in light of the other provisions . . . and every provision must be given effect if it is possible to do so. . . . If the language of the contract is susceptible to more than one reasonable interpretation, the contract is ambiguous." (Citations omitted; internal quotation marks omitted.) Id., 670–71. In addition, "[a] contract must be construed to effectuate the intent of the parties, which is determined from the language used interpreted in the light of the situation of the parties and the circumstances connected with the transaction." (Internal quotation marks omitted.) *Alstom Power, Inc.* v. *Balcke-Durr, Inc.*, 269 Conn. 599, 610, 849 A.2d 804

(2004); see also *Flaherty* v. *Flaherty*, 120 Conn. App. 266, 269, 990 A.2d 1274 (2010).

Thus, our task is not to determine which party's interpretation of the contract is the correct—or even the stronger—one. Our sole task is to determine, applying all of these guidelines, whether, on one hand, the language of the contract is clear and conveys a definite and precise intent, or, on the other hand, the language of the contract is susceptible to more than one reasonable interpretation. I conclude that, applying these guidelines, the language of the contractual clause is susceptible to more than one reasonable interpretation, namely, that the time of the transfer of an ownership interest in the premises contemplated by the contingency clause was at the time of the closing of the Vaughn purchase agreement.

I therefore focus on the language of the contingency clause, that, if within the one year period, "any ownership interest in the Premises . . . is transferred to a 'Non-Wolczek Person' based on a whole property value of more than $3,500,000, Buyer [Wolczek] shall pay to Seller [Salce] an additional purchase price equal to one-half of the excess at the same time of the transfer. The 'excess' is the amount by which the whole property value for the transfer exceeds $3,500,000. The 'whole value' for any sale is the 100% value on which any percentage interest being transferred is based. For example, a one-quarter interest transferred for $1,000,000 would equate to a whole property value of $4,000,000." Viewed in the context of the entire transaction between the parties, it is a reasonable interpretation of this language that its general purpose was to ensure that, if the defendant sold the premises at a profit (measured by the parties' valuation when the defendant bought out the plaintiff) within one year of his purchase of the plaintiff's interest, the plaintiff would share proportionally in that profit.

It is true, as the majority concludes, that the language "any ownership interest . . . is transferred" could well have been intended to include the doctrine of equitable conversion. Our Supreme Court has stated: "Under the doctrine of equitable conversion . . . the purchaser of land under an executory contract is regarded as the owner, subject to the vendor's lien for the unpaid purchase price, and the vendor holds the legal title in trust for the purchaser. . . . The vendor's interest thereafter in equity is in the unpaid purchase price, and is treated as personalty . . . while the purchaser's interest is in the land and is treated as realty." (Citations omitted; internal quotation marks omitted.) *Francis T. Zappone Co.* v. *Mark,* supra, 197 Conn. 267. It is also true, however, that this statement regarding the purported limited interest of a contract seller before the closing is overbroad because, until the closing, the seller generally retains the right to possession of the premises, and remains responsible for its real estate taxes and for keeping it insured and maintained. See *Reid* v. *Landsberger,* 123 Conn. App. 260, 269, 1 A.3d 1149, cert. denied, 298 Conn. 933, 10 A.3d 517 (2010); see also 14 R. Powell & P. Rohan, Powell on Real Property §§ 81.01, 81.03 [3], pp. 81-6 through 81-8, 81-101 through 81-102. Thus, even under the doctrine of equitable conversion, a purchase agreement does not transfer a 100 percent ownership interest in a property.

A close examination of the language of the contingency clause, read in the context of the entire buyout agreement and in the context of the transaction as a whole, discloses an alternative reasonable interpretation of the phrase "[i]f . . . any ownership interest . . . is transferred," namely, if a 100 percent ownership of the property or *any fractional interest therein* is transferred. That alternative reasonable interpretation is as follows.

The language of the contingency clause directly links the transfer of "any ownership interest" to the excess over the original "whole property value," established by the parties in their buyout agreement. The "whole property value" is then defined (although referred to here, not as the "whole property value" but as the "whole value") as "the 100% value on which *any percentage interest* being transferred is based." (Emphasis added.) That linkage is then directly linked to the sole example given by the parties themselves, namely, a transfer of a one-quarter interest in the property.

To explain further, under the language of the contingency clause, the only significance of the transfer of an ownership interest by the defendant is if the transfer is for more than the parties valued it. The consequence of such a transfer to a "Non-Wolczek Person" is that, if the transfer is for more than the "whole property value" of $3.5 million, the defendant must pay the plaintiff an amount equal to "one-half the excess at the time of the transfer," the "excess" being defined explicitly as "the amount by which the *whole property value for the transfer* exceeds $3,500,000." (Emphasis added.) Further, the "whole value" is defined specifically as "the 100% value on which *any percentage interest* being transferred is based." (Emphasis added.) This language is then illustrated by the single example chosen by the parties: "For example, a one-quarter interest transferred for $1,000,000 would equate to a whole property value of $4,000,000." This linkage—a transfer of an ownership interest, linked to the whole property value, linked to the 100 percent value or any fractional value—lends itself to the reasonable interpretation that, in using the language, "if any ownership interest . . . is transferred," the parties were referring to a 100 percent ownership interest or any fractional interest being transferred, rather than referring to an equitable interest being transferred, which is not easily equated to

either a 100 percent ownership interest or a fraction thereof.

My point here is not that the majority is necessarily incorrect in its assertion that the doctrine of equitable conversion triggered the additional purchase price. My point is solely that it is not *unambiguously so* that the parties intended to refer to the doctrine of equitable conversion when they used the phrase "any ownership interest . . . is transferred."

Furthermore, the language of the clause, "Buyer [defendant] shall pay to Seller [plaintiff] an additional purchase price equal to one-half the excess *at the same time as the transfer*," further renders the contingency clause ambiguous, because it supports the reasonable interpretation that such an obligation arises at the time of the closing on the Vaughn purchase agreement, rather than at the time of the entry into the Vaughn purchase agreement. It is a reasonable interpretation of this language that the parties intended the phrases "ownership interest . . . is transferred" and "at the same time as the transfer" to refer to the actual transfer of legal title—either the full legal title or some fractional interest thereof—at the closing, because that would, under ordinary expectations of real estate transactions, be the time when the defendant would have the funds available to satisfy that obligation. Indeed, the plaintiff acknowledged at oral argument before this court that his interpretation would obligate the defendant to pay the required excess at the time the defendant entered into the Vaughn purchase agreement, even if that agreement never closed through no fault of the defendant and, therefore, the defendant never realized the profit that the parties' buyout agreement contemplated he would share with the plaintiff. The somewhat unlikelihood of this scenario being what the parties intended by their language lends further support to the alternative reasonable interpretation that I propose.

It is also true, as the plaintiff argues, that the fact that the contract at issue is between sophisticated parties and is commercial in nature raises a presumption that the contract language is definitive. It is equally true, however, that in the present case, the plaintiff drafted the language in question, which ordinarily means that any ambiguity would be resolved against the drafter. See *Ramirez* v. *Health Net of the Northeast, Inc.*, 285 Conn. 1, 13–14, 938 A.2d 576 (2008). Although that does not itself create an ambiguity; see *Mongillo* v. *Commissioner of Transportation*, 214 Conn. 225, 231, 571 A.2d 112 (1990); I do think that, in the present case, the language in question is ambiguous enough to overcome the presumption, and the fact that the plaintiff drafted the language supports the reasonableness of the alternative interpretation offered by the defendant.

I would, therefore, reverse the judgment of the trial court and remand the case for further proceedings according to law.