******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

ANTHONY H. SALCE, SR. *v.* WALTER WOLCZEK
(SC 19144)

Palmer, Zarella, Eveleigh, McDonald, Espinosa, Robinson and
Vertefeuille, Js.

*Argued May 20—officially released December 9, 2014*

*Robert M. Shields, Jr.*, with whom was *Wesley W. Horton*, for the appellant (defendant).

*Jeffrey J. White*, with whom was *Benjamin C. Jensen*, for the appellee (plaintiff).

*Opinion*

ESPINOSA, J. The principal issue in this certified appeal is whether a contract between the parties is ambiguous, requiring a trial to determine the parties' intent. The trial court found that the contract at issue unambiguously entitled the plaintiff, Anthony H. Salce, Sr., to judgment as a matter of law, rendered summary judgment in his favor, and awarded, among other relief, postjudgment interest. The Appellate Court affirmed the trial court's judgment. *Salce* v. *Wolczek*, 141 Conn. App. 528, 530, 61 A.3d 1177 (2013). On appeal to this court, the defendant claims that the Appellate Court's decision was improper because (1) the contract at issue was ambiguous, precluding summary judgment, and (2) the trial court could not award postjudgment interest after declining to award prejudgment interest. Because we conclude that the contract language is unambiguous and that the trial court properly awarded postjudgment interest, we affirm the Appellate Court's judgment.

The parties stipulated to the facts relevant to this appeal. The plaintiff and the defendant each owned 50 percent of Anwalt, LLC (Anwalt). Anwalt owned commercial real estate, an office park, in Trumbull (premises). In April, 2007, the plaintiff agreed to sell his 50 percent interest in Anwalt to the defendant. On April 13, 2007, the parties executed a buyout agreement that provided for a purchase price, due at closing, of $1.75 million. The agreement also contained a provision that required the defendant to pay the plaintiff an addition to the purchase price if specified conditions were met (contingency clause).

The contingency clause, in essence, required the defendant to pay to the plaintiff a contingent addition to the purchase price if, at any point within one year from the closing of the buyout agreement, the defendant transferred any ownership interest in the premises to a third party, for more than a certain amount of money. The clause provides as follows: "Contingent Addition to Purchase Price. If within one year of the closing hereunder any ownership interest in the [p]remises . . . is transferred to a 'Non-Wolczek Person' based on a whole property value of more than [$3.5 million], [the defendant] shall pay [the plaintiff] an additional purchase price equal to one half the excess at the same time as the transfer. The 'excess' is the amount by which the whole property value for the transfer exceeds [$3.5 million]. The 'whole value' for any sale is the 100 [percent] value on which any percentage interest being transferred is based. For example, a one quarter interest transferred for [$1 million] would equate to a whole property value of [$4 million]. A 'Non-Wolczek Person' is someone other than [the defendant] or his immediate family member or lineal descendant."

The parties closed on the sale under the buyout

agreement on May 31, 2007, starting the clock on the one year period in the contingency clause.[1] Less than one year later, on March 29, 2008, the defendant entered into a contract to sell the entire premises to a third party, Brian Vaughn, who is a " '[n]on-Wolczek [p]erson' " as defined in the contingency clause. The sales price under the defendant's contract with Vaughn (Vaughn contract) was $5.5 million—$2 million more than the minimum amount required to trigger the contingency clause. The defendant and Vaughn closed on the sale of the premises on July 1, 2008—approximately one month after the one year period specified in the contingency clause expired.[2]

Following the closing between the defendant and Vaughn, the plaintiff filed an action against the defendant alleging, among other claims, that the defendant breached the buyout agreement by not paying the plaintiff a contingent addition to the purchase price as required by the contingency clause.

The plaintiff later moved for summary judgment on his breach of contract claim. He argued that the contingency clause unambiguously required the defendant to pay an addition to the purchase price because the Vaughn contract constituted a transfer of an ownership interest within the meaning of the contingency clause. The plaintiff argued that (1) the contingency clause required the defendant to pay an addition to the purchase price "[i]f within one year of [May 31, 2007] any ownership interest in the [p]remises . . . is transferred to a '[n]on-Wolczek [p]erson' " for more than a specified amount; (2) the defendant executed a contract with Vaughn for the sale of the premises during the one year period prescribed in the contingency clause; (3) the value of the sale exceeded the amount specified in the contingency clause; (4) the defendant's execution of the contract with Vaughn transferred equitable ownership of the premises to Vaughn; and (5) the transfer of equitable ownership qualifies as a transfer of "any ownership interest" under the contingency clause.

The defendant objected, arguing that the contingency clause was ambiguous, making its interpretation a question of fact and requiring a trial. The defendant argued that the contingency clause was unclear as to whether it applied to a transfer of equitable ownership upon signing a contract for sale, or to only a transfer of legal title at closing. The defendant claimed that if the contingency clause applied only to the transfer of legal title at closing, then he did not owe an addition to the purchase price because he did not close on his contract with Vaughn until after the one year period in the contingency clause had expired.

The trial court granted the plaintiff's motion. The trial court determined that the expansive phrase " 'any ownership interest' " used in the contingency clause included a transfer of equitable ownership through the

doctrine of equitable conversion. Under that doctrine, equitable ownership passes to the purchaser of real estate at the time a contract for sale is executed; legal title is held in trust by the seller for the benefit of the buyer and legal title passes at the closing on the sale. See, e.g., *Francis T. Zappone Co.* v. *Mark*, 197 Conn. 264, 267, 497 A.2d 32 (1985). Relying on this doctrine, the trial court determined that the execution of the Vaughn contract, which occurred within the one year period of the contingency clause, conveyed equitable ownership to Vaughn, and thus qualified as a transfer of an ownership interest, triggering the contingency clause. The court rejected the defendant's argument that the contingency clause was ambiguous and could refer, instead, to only the closing of a sale. The trial court determined that the defendant's interpretation was "more restrictive" than the language used by the parties and thus was not a reasonable alternative interpretation.

The plaintiff withdrew the remaining counts of his complaint and moved for final judgment on the breach of contract count. The trial court granted the motion, rendered judgment for the plaintiff, and awarded the plaintiff his requested damages, attorney's fees, offer of compromise interest, costs, and postjudgment interest. The trial court declined to award prejudgment interest.

A divided Appellate Court panel affirmed the trial court's judgment. *Salce* v. *Wolczek*, supra, 141 Conn. App. 530. The defendant principally claimed on appeal that the trial court improperly found the contingency clause unambiguous, and that it improperly awarded postjudgment interest after declining to award prejudgment interest.[3] Id. The Appellate Court majority agreed with the trial court, however, and concluded that the contingency clause unambiguously required the defendant to pay to the plaintiff an addition to the purchase price under the buyout agreement. Id., 533–35. The Appellate Court majority also rejected the defendant's challenge to the postjudgment interest award. Id., 536–38. The dissenting judge disagreed, concluding, instead, that the contingency clause was ambiguous because it was not clear that the parties intended the contingency clause to apply to the transfer of an equitable ownership interest. Id., 544–46 (*Borden, J.*, dissenting).

The defendant then petitioned this court for certification. We granted the petition for certification, limited to the following questions: "(1) Did the Appellate Court properly determine that the contract language unambiguously established that the mere execution of a contract for sale, and not the actual closing on the sale, was intended to trigger the defendant's payment obligation? (2) If the answer to the first question is in the [affirmative], did the Appellate Court properly affirm the trial court's postjudgment interest award?"[4] *Salce* v. *Wolczek*, 308 Conn. 944, 66 A.3d 885 (2013).

## I

The defendant chiefly claims that the language of the contract is ambiguous. Consequently, he contends that the trial court improperly concluded that the contingency clause unambiguously required the defendant to pay the plaintiff an addition to the purchase price. We disagree.

At the outset, we note that the scope of our review under the first certified question in this case is narrow and requires us to determine only whether the language of the contingency clause is ambiguous. We do not decide which party has the better interpretation, only whether there is more than one reasonable interpretation of the contract language at issue. If we conclude that the language allows for more than one reasonable interpretation, the contract is ambiguous and the trial court's decision to render summary judgment, based on the conclusion that the contract is unambiguous, must be reversed and the matter remanded for a trial. Conversely, if the contract is unambiguous, its interpretation and application is a question of law for the court, permitting the court to resolve a breach of contract claim on summary judgment if there is no genuine dispute of material fact. *Ramirez* v. *Health Net of the Northeast, Inc.*, 285 Conn. 1, 10–11, 938 A.2d 576 (2008). If the contract is unambiguous, therefore, our inquiry into its meaning ends, and we will affirm the judgment. The principles that guide our consideration of whether contract language is ambiguous are set forth in detail in *Yellow Book Sales & Distribution Co.* v. *Valle*, 311 Conn. 112, 118–19, 84 A.3d 1196 (2014), *Cruz* v. *Visual Perceptions, LLC*, 311 Conn. 93, 102–103, 84 A.3d 828 (2014), and *Ramirez* v. *Health Net of the Northeast, Inc.*, supra, 13.

Turning to the contract language at issue, the text of the contingency clause sets out four prerequisites for triggering an additional payment under that provision: (1) if "within one year of the closing" of the buyout agreement; (2) "any ownership interest in the [p]remises . . . is transferred" by the defendant; (3) " 'to a [n]on-Wolczek [p]erson' "; (4) "based on a whole property value of more than [$3.5 million]"; then the defendant must pay the plaintiff an addition to the purchase price. The parties agree that the execution of the Vaughn contract satisfies the first, third, and fourth requirements—the parties executed the contract less than one year after the closing of the buyout agreement, Vaughn is a " '[n]on-Wolczek [p]erson,' " and the value of the Vaughn contract was $5.5 million.

The parties' dispute is limited to the second requirement. The trial court and the Appellate Court each determined that the broad phrase "any ownership interest . . . is transferred" unambiguously includes the conveyance of equitable ownership through the execu-

tion of a contract for sale. The defendant agrees that this interpretation is reasonable, but contends that the text also supports another reasonable interpretation, rendering the contingency clause ambiguous.

According to the defendant, the common understanding of the phrase "any ownership interest . . . is transferred" could refer instead to *only* a transfer of legal title and exclude a transfer of equitable ownership. The defendant suggests that the average person would understand that phrase to refer to the sale of the property at a formal closing, not to the transfer of equitable ownership through the mere execution of a contract for sale. The defendant argues that the reason the parties chose the otherwise broad phrase "any ownership interest" was not that it would apply to a transfer of equitable ownership, but instead to address the possibility that the defendant might transfer only a portion of his ownership interest. Hence, the defendant interprets the phrase "any ownership interest . . . is transferred" to mean any *fraction of legal* ownership interest is transferred. To support his interpretation, the defendant relies on the contingency clause's definition of "whole property value . . . ." The contingency clause defines "whole value" (though it omits the term "property" in the definition) as "the 100 [percent] value on which *any percentage interest* being transferred is based. For example, a one quarter interest transferred for [$1 million] would equate to a whole property value of [$4 million]." (Emphasis added.) On the basis of this language, the defendant contends that the reference to a "percentage interest" transfer demonstrates that one might reasonably interpret the broad phrase "any ownership interest" to address, not a transfer of equitable ownership, but the possibility that the defendant might transfer only a fraction of his legal ownership interest. The defendant argues that "the most logical inference is that the purpose of the [phrase] 'any ownership interest' in the first sentence was to include a fractional interest transferred as well as a whole interest."

In response, the plaintiff argues that the expansive phrase "any ownership interest . . . is transferred" is broad enough to be triggered by *either* a conveyance of equitable ownership *or* a transfer of legal title. The plaintiff contends that the defendant's argument restricts the meaning of the text and that, if the parties intended to give the contingency clause the more limited meaning offered by the defendant, they needed to do so expressly, but did not. Because the Vaughn contract conveyed equitable ownership to a third party, the plaintiff claims that the prerequisites for a purchase price addition are met. We agree with the plaintiff.

The plain meaning of the phrase "any ownership interest . . . is transferred" is broad and refers, as the text states, to the transfer of *any* ownership interest, regardless of the type or quantity of ownership interest

transferred. The defendant treats this phrase as if it can refer only to *either* a transfer of equitable ownership *or* a transfer of legal title, but not both. But the broad language used by the parties does not support this restrictive interpretation. The parties' use of the word "any" to modify the phrase "ownership interest" in the first sentence of the contingency clause gives the resulting phrase an expansive meaning—one that we will not restrict in the absence of a clear limitation in the text. See, e.g., *Ramirez* v. *Health Net of the Northeast, Inc.*, supra, 285 Conn. 14 (use of " 'any' " in phrase " 'any reason' " gives phrase broad and inclusive meaning [emphasis omitted]); see also *AvalonBay Communities, Inc.* v. *Zoning Commission*, 280 Conn. 405, 413, 908 A.2d 1033 (2006) (legislature's use of " 'any' " in statute is "broad and all-inclusive" [emphasis omitted]); *Manifold* v. *Ragaglia*, 272 Conn. 410, 422, 862 A.2d 292 (2004) (court will not provide "exception or limitation" to language made broad by use of word " '[a]ny' " [emphasis omitted]); *Gipson* v. *Commissioner of Correction*, 257 Conn. 632, 640, 778 A.2d 121 (2001) ("'[t]he word any in statutes is generally used in the sense of all or every and its meaning is comprehensive in scope and inclusive in range' "); *Fink* v. *Golenbock*, 238 Conn. 183, 196, 680 A.2d 1243 (1996) (phrase " '[a]ny disputes' " is "all-embracing, all-encompassing and broad" [emphasis omitted]); *New York, New Haven & Hartford Railroad Co.* v. *Stevens*, 81 Conn. 16, 21, 69 A. 1052 (1908) ("[t]he word 'any' is too comprehensive to receive so narrow a construction"); *New Haven Young Men's Institute* v. *New Haven*, 60 Conn. 32, 39, 22 A. 447 (1891) ("[t]he word 'any,' used as an adjective, means 'one out of several or many' ").[5] The text does not distinguish between equitable or legal ownership, or between a transfer of a fractional or whole interest. Nothing in the contingency clause expressly limits its application to transfers of legal ownership. Nor does the contingency clause require the transfer to take place at a formal closing. The parties used the term "closing" throughout the buyout agreement when they intended to refer specifically to that event, but did not do so in the text at issue. We presume that they did this intentionally. See *Tallmadge Bros., Inc.* v. *Iroquois Gas Transmission System, L.P.*, 252 Conn. 479, 496–97, 505–506, 746 A.2d 1277 (2000); see also *Bank of Boston Connecticut* v. *Schlesinger*, 220 Conn. 152, 159, 595 A.2d 872 (1991) ("[t]he parties could have written such an agreement, but they did not do so"). In the absence of any express limitation in its text, the contingency clause is broad enough to include both a conveyance of equitable ownership on the signing of a contract and the passing of legal title at a closing. The defendant's conveyance of equitable ownership through his execution of the Vaughn contract consequently falls squarely within the reach of the contingency clause.

The Vaughn contract conveyed equitable ownership

to Vaughn under the doctrine of equitable conversion. Although labeled "somewhat esoteric" by the trial court, equitable conversion is a "settled principle" under which "a contract for the sale of land vests equitable title in the [buyer]." (Internal quotation marks omitted.) *FCM Group, Inc.* v. *Miller*, 300 Conn. 774, 799, 17 A.3d 40 (2011); *Lanna* v. *Greene*, 175 Conn. 453, 461, 399 A.2d 837 (1978); see also *Bayer* v. *Showmotion, Inc.*, 292 Conn. 381, 415, 973 A.2d 1229 (2009); *Francis T. Zappone Co.* v. *Mark*, supra, 197 Conn. 267; see generally *Connecticut College for Women* v. *Groton*, 123 Conn. 196, 201, 193 A. 873 (1937). "Under the doctrine of equitable conversion . . . the purchaser of land under an executory contract is regarded as the owner, subject to the vendor's lien for the unpaid purchase price, and the vendor holds the legal title in trust for the purchaser. . . . The vendor's interest thereafter in equity is in the unpaid purchase price, and is treated as personalty . . . while the purchaser's interest is in the land and is treated as realty." (Citations omitted; internal quotation marks omitted.) *Francis T. Zappone Co.* v. *Mark*, supra, 267. The doctrine is a legal fiction, rooted in the principle that equity views a transaction as being completed at the time the parties enter into the transaction, irrespective of whether a formal exchange of legal title has taken place. Id.; see also *Emery* v. *Cooley*, 83 Conn. 235, 238–39, 76 A. 529 (1910); 1 D. Dobbs, Law of Remedies: Damages–Equity–Restitution (2d Ed. 1993) § 4.3 (8), pp. 620–21. In the context of real estate transactions, equitable ownership in property transfers to the buyer when the parties sign a contract for sale, even though the formal exchange of legal title may not occur until a later date. See *Francis T. Zappone Co.* v. *Mark*, supra, 267. The seller of the land becomes a trustee, holding land in trust for the buyer; the buyer holds the purchase money in trust for the seller. See id.

As its name suggests, equitable ownership is a type of ownership interest. Although the conveyance of equitable ownership does not grant an immediate right to possession, it grants the purchaser other significant rights in the property. See id., 267–68; 27A Am. Jur. 2d 520–21, Equitable Conversion § 13 (2008). For instance, the purchaser obtains the right to specific performance to force a seller to convey legal title according to the contract for sale and to prevent the seller from conveying it to a third party. See *Francis T. Zappone Co.* v. *Mark*, supra, 267–68 (equitable conversion gives purchaser equitable title to property); see also 1 D. Dobbs, supra, § 4.3 (8), p. 620. The purchaser also may mortgage his interest in the property, even in advance of a formal closing. 27A Am. Jur. 2d, supra, § 13, p. 520. And if the buyer dies before closing, the buyer's interest in the land, treated as a realty interest, becomes part of the buyer's estate. 1 D. Dobbs, supra, pp. 623–24. Accordingly, by executing the Vaughn contract, the

defendant conveyed an ownership interest in the premises to Vaughn.

Furthermore, the defendant's conveyance of equitable ownership meets the contingency clause's requirement that an ownership interest be "transferred." Transfer is defined as "to convey from one person, place, or situation to another" or "to cause to pass from one to another . . . ." Merriam-Webster's Collegiate Dictionary (11th Ed. 1993). In *Francis T. Zappone Co.* v. *Mark*, supra, 197 Conn. 268, this court concluded that a contract for the sale of land amounted to a transfer of equitable ownership and triggered a party's duty to pay a brokerage commission on the sale. In reaching this conclusion, this court rejected the argument that no transfer took place even though the parties to the sale had yet to pass " 'paper' title . . . ." Id. This reasoning applies equally to the present case. The defendant's execution of the Vaughn contract transferred equitable ownership to Vaughn. No closing was necessary to accomplish this transfer.[6] Having conveyed equitable ownership to Vaughn, the defendant transferred an ownership interest to a " '[n]on-Wolczek [p]erson' " and did so within the one year period in the contingency clause, unambiguously triggering the defendant's obligation to pay an addition to the purchase price.

The defendant's alternative interpretation unreasonably restricts the language of the contingency clause. The text does not limit the meaning of the phrase "any ownership interest" to only transfers of legal ownership interests, whether whole or fractional, to the exclusion of all other types of ownership interests. If the parties intended to limit the scope of the language they chose for their agreement, they needed to state that limitation expressly. See, e.g., *Tallmadge Bros., Inc.* v. *Iroquois Gas Transmission System, L.P.*, supra, 252 Conn. 496; *Herbert S. Newman & Partners, P.C.* v. *CFC Construction Ltd. Partnership*, 236 Conn. 750, 759, 674 A.2d 1313 (1996); *Hatcho Corp.* v. *Della Pietra*, 195 Conn. 18, 22, 485 A.2d 1285 (1985). Furthermore, the use of an example to explain how a provision applies in a particular instance does not, itself, restrict the meaning of that provision, especially one intentionally made broad by the use of the word "any." See, e.g., *United States* v. *National City Lines, Inc.*, 337 U.S. 78, 81, 69 S. Ct. 955, 93 L. Ed. 1226 (1949) ("Obviously, an example is not a complete catalogue. The use of an example implies no purpose to restrict the meaning of the statutory phrase 'any civil action' precisely to the illustration selected.").[7] We will not insert limitations into a contract when the parties did not do so themselves. *Tallmadge Bros., Inc.* v. *Iroquois Gas Transmission System, L.P.*, supra, 501–502. This is especially so when, as here, the agreement is between sophisticated commercial parties represented by counsel. Id., 496–97, 506. In these circumstances, we presume the parties used definitive language to describe their agreement. Id.,

497.[8]

As further evidence that the parties intended to refer only to the passing of legal title at closing, the defendant cites to the portion of the contingency clause requiring the addition to the purchase price to be paid to the plaintiff at the same time as the transfer to a third party. The defendant posits that this provision ensures that he would have cash from the proceeds of the sale of his interest to pay the plaintiff any additional amount owed. The defendant claims it would be unreasonable to require him to pay the plaintiff when he has not yet received payment from the third party or if the sale to the third party falls apart before closing. According to the defendant, "[t]o require [him] to pay the plaintiff his proportionate share of a nonexistent profit seems highly unlikely." We disagree.

The defendant's receipt of funds from a third party is irrelevant to his obligations under the contingency clause. Nothing in the contingency clause makes the defendant's obligation to pay the plaintiff contingent on his receipt of payment from a third party at closing. Rather, the defendant must pay the plaintiff at the time he transfers any ownership interest to a third party, irrespective of whether he has been paid for that transfer. And the contingency clause allows for the possibility that the defendant might not have received sufficient cash from his transfer to a third party to cover the addition to the purchase price owed to the plaintiff. The contingency clause requires that the addition to the purchase price be calculated based on the "whole property value" of a transfer, as if the defendant had transferred his entire interest, even if the defendant transfers only a small fraction of his interest in the premises. This means that the defendant could receive only a small amount of money for his transfer, but still owe the plaintiff a much larger sum. The plaintiff's brief provides an example. The defendant could trigger the contingency clause by transferring only 1 percent of his interest. The contingency clause would, however, require the parties to determine the amount owed to the plaintiff by assuming that the defendant had transferred *100 percent* of his interest. In that scenario, the amount the defendant receives for the 1 percent transfer would be only a small portion of what he owes to the plaintiff based on the "whole property value," requiring the defendant to use his own funds to pay the plaintiff the entire amount due under the contingency clause. Despite this possibility, the contingency clause does not make the defendant's additional payment obligation contingent on how much he receives for his transfer to a third party or when he receives that payment, contradicting the defendant's interpretation.

In addition, the defendant's interpretation that the contingency clause is a profit sharing provision is premised on a misunderstanding of its apparent purpose.

The payment due under the contingency clause is not, as the defendant suggests, a share of any profit from the defendant's transfer, but an adjustment of the original buyout price based on the defendant's acknowledgment of a market price greater than $3.5 million within one year of the buyout. The text of the contingency clause and its relationship to the other provisions in the contract make that clear. For instance, the parties placed the contingency clause in the section of the contract entitled "Purchase Price," and labeled it "Contingent Addition to Purchase Price." Also, the text of the contingency clause expressly refers to the payment due under that clause as "an additional purchase price . . . ." By contrast, the contingency clause lacks features that even the defendant acknowledges would ordinarily be included if it were a profit sharing provision. If the parties intended it to serve as a profit sharing provision, one would expect that provision to allow the plaintiff to share only in a portion of the profit only from the quantity of the defendant's interest that he actually sold. As explained previously, the contingency clause, however, requires the defendant to pay the plaintiff an addition to the purchase price based on the "whole property value," irrespective of whether the defendant actually sells his entire interest or only a small fraction. The contingency clause does not allow the defendant, when calculating the amount owed to the plaintiff, to make any adjustment or deduction for his costs associated with the sale of his ownership interest. Because the contingency clause is an adjustment to the purchase price, the additional amount due under that clause is part of the consideration owed to the plaintiff for the defendant's original purchase of the plaintiff's share of Anwalt. It is not a share of profits on a later sale. Accordingly, the prerequisites of the clause are satisfied once the defendant acknowledges a greater market value by transferring an interest to a third person for an amount greater than that specified in the contingency clause. The additional payment then becomes due to the plaintiff at the time of the transfer. Whether and when the defendant receives payment from a third party for any transfer is irrelevant to the purpose of the clause.[9]

Going beyond the contract language, the defendant cites testimony by each party that reveals they did not have a transfer of equitable ownership in their minds when they chose the language for the buyout agreement. This evidence is irrelevant and inadmissible to vary the meaning of unambiguous contract language. We do not look to the parties' subjective intentions when interpreting a contract. *C & H Electric, Inc.* v. *Bethel*, 312 Conn. 843, 860, 96 A.3d 477 (2014). Nor may we look to evidence outside of the contract to vary the meaning of unambiguous language. *Yellow Book Sales & Distribution Co.* v. *Valle*, supra, 311 Conn. 119. Instead, we must discern the parties' intent, in the first instance,

from the language they used and not the language we think they might have chosen if confronted with this particular issue. See *Tallmadge Bros., Inc.* v. *Iroquois Gas Transmission System, L.P.*, supra, 252 Conn. 500, 506; see also *Williams* v. *Lilley*, 67 Conn. 50, 59, 34 A. 765 (1895) ("[w]e assume no right to add a new term to a contract, though it were clear that had the attention of the parties been called to it in all probability it would have been inserted").

The parties chose broad language that unambiguously includes a conveyance of equitable ownership. We presume that they were aware of existing legal doctrine and the legal consequences of the language they chose for their contract. See, e.g., *Hatcho Corp.* v. *Della Pietra*, supra, 195 Conn. 21; *LMK Enterprises, Inc.* v. *Sun Oil Co.*, 86 Conn. App. 302, 307, 860 A.2d 1229 (2004). The defendant's attempts to restrict the meaning of that language simply are not supported by the text. We will not trammel the sweeping language chosen by the parties to arrive at a more limited meaning. See generally *Yellow Book Sales & Distribution Co.* v. *Valle*, supra, 311 Conn. 119; *Cruz* v. *Visual Perceptions, LLC*, supra, 311 Conn. 102–103; *Tallmadge Bros., Inc.* v. *Iroquois Gas Transmission System, L.P.*, supra, 252 Conn. 506.

Accordingly, the Appellate Court properly determined that the unambiguous contract language entitled the plaintiff to summary judgment on his breach of contract claim.

## II

The defendant also claims that the trial court improperly awarded the plaintiff postjudgment interest even though the trial court had already decided that prejudgment interest was unwarranted. In support of this claim, the defendant asserts that because "there was no substantive difference" between the "factors and evidence" considered by the court with respect to its prejudgment and postjudgment interest decisions, the court could not properly award one type of interest after refusing to award the other. We disagree.

The defendant's argument is flatly contradicted by the trial court's decision. The trial court declined to award prejudgment interest after concluding that the defendant pursued his defense of the plaintiff's claims in good faith. The court expressly determined, however, that the balance of equities changed once the trial court resolved the parties' dispute in the plaintiff's favor. Accordingly, the reason for the different decisions regarding prejudgment and postjudgment interest was the intervening conclusion by the trial court that the plaintiff was entitled to payment. Although the defendant expressed that he would continue to press his good faith defense on appeal, the trial court was well within its right to conclude that the balance of equities

had changed in the plaintiff's favor. Whether to award prejudgment and postjudgment interest for the detention of money under General Statutes § 37-3a is a decision left to the discretion of the trial court, and requires the trial court to consider whether an award of interest is fair and equitable under the circumstances. See, e.g., *Chapman Lumber, Inc.* v. *Tager*, 288 Conn. 69, 99–100, 952 A.2d 1 (2008). The trial court's discretion in awarding interest is quite broad, and the court may consider "whatever factors may be relevant to its determination." *DiLieto* v. *County Obstetrics & Gynecology Group, P.C.*, 310 Conn. 38, 54, 74 A.3d 1212 (2013). The assertion of a good faith defense is one factor that the court may consider, but it does not bar an award of interest. See, e.g., *Sosin* v. *Sosin*, 300 Conn. 205, 229–35, 14 A.3d 307 (2011). The defendant's continued assertion of his defense on appeal, therefore, does not prevent the trial court from exercising its discretion to award interest, especially in light of its decision that the plaintiff is entitled to payment on the debt owed. *DiLieto* v. *County Obstetrics & Gynecology Group, P.C.*, supra, 60 n.18 ("the purpose of postjudgment interest is not to punish defendants but, rather, to compensate plaintiffs for the loss of the use of their money, after the fact finder has determined that the money is due and owing, during the pendency of any appeals"). The trial court thus acted well within its discretion when it awarded the plaintiff postjudgment interest.[10]

The judgment of the Appellate Court is affirmed.

In this opinion ZARELLA, EVELEIGH and McDON-ALD, Js., concurred.

[1] After the closing of the buyout agreement, the defendant caused Anwalt to transfer ownership of the premises to a family owned limited liability company. This transfer did not trigger the contingency clause and does not otherwise impact this appeal.

[2] The defendant and Vaughn each used limited liability companies to transfer and hold their respective ownership interests in the premises, but the parties agree that their use and the identity of those entities are irrelevant to the issues in this appeal. For simplicity, we refer to the defendant and Vaughn, rather than the respective entity each of them used, when discussing their roles in the transactions at issue.

[3] The defendant also challenged the trial court's calculation of damages, but the Appellate Court upheld the trial court's decision; *Salce* v. *Wolczek*, supra, 141 Conn. App. 530; and the defendant has not appealed to this court on that basis.

[4] The second certified question originally stated, in part: "If the answer to the first question is in the *negative* . . . ." (Emphasis added.) *Salce* v. *Wolczek*, 308 Conn. 944, 66 A.3d 885 (2013). The question should have used "affirmative" in place of "negative," and we have edited the certified question accordingly. See *State* v. *Ouellette*, 295 Conn. 173, 184, 989 A.2d 1048 (2010).

[5] We agree with the dissenting justices that the meaning of the term "any" can vary depending on its context. See *Ames* v. *Commissioner of Motor Vehicles*, 267 Conn. 524, 531, 839 A.2d 1250 (2004) ("any" can mean, among other things, "all, every, some or one" [internal quotation marks omitted]). In the present case, however, the parties used "any" as an indeterminate adjective that modifies the phrase "ownership interests." In this context, the word "any" tells the reader which ownership interest transfers will trigger the contingency clause. The answer is that the transfer of "*any* ownership interest" will trigger it, without any limitation provided for the type or quantity of ownership interest transferred. See Webster's Third New International Dictionary (2002) (defining "any" as "one or some indiscriminately of whatever kind").

[6] We note that preconditions in a sales contract can delay the transfer of equitable interest until those conditions are met. See 14 Powell on Real Property (M. Woolf ed., 2007) § 81.03 [1], p. 81-86. In the present case, however, the defendant has not claimed that there were preconditions in the Vaughn contract that prevented the transfer of equitable ownership during the one year period in the contingency clause.

[7] At oral argument before this court, the defendant, for the first time, also suggested that the word "sale" that appears in the contract's definition of "whole value" supports his interpretation. The defendant argued that one might interpret the term "sale" to refer to the exchange of money and legal title at a formal closing. But the common meaning of that term, according to its dictionary definition, contradicts the defendant's interpretation. Webster's Third New International Dictionary (2002) most relevantly defines "sale" as "a *contract* transferring the absolute or general ownership of property from one person or corporate body to another for a price . . . ." (Emphasis added.) As such, and contrary to the defendant's claim, the use of the word "sale" in the contingency clause does not demonstrate an intent to limit the meaning of the broad phrase "any ownership interest . . . is transferred" to only the transfer of legal title at closing.

[8] The dissenting justices agree with the defendant that the phrase "any ownership interest" is ambiguous because the parties might have intended it to mean a transfer of any *fraction of legal* ownership interest.

We disagree that this interpretation is tenable in light of the parties' failure to include this limitation in their contract. The dissent observes that "the contingency clause is replete with language *expressly* addressing fractional interests." (Emphasis in original.) This fact demonstrates that the parties were well aware of the notion of fractional interest transfers when drafting their contract, but nevertheless chose not to limit the scope of the phrase "any ownership interest" to only a transfer of any *fraction of legal* ownership interest. We presume that the omission of limiting language (and the parties' use of the broader phrase "any ownership interest") was intentional. See *Tallmadge Bros., Inc.* v. *Iroquois Gas Transmission System, L.P.*, supra, 252 Conn. 497; *Bank of Boston Connecticut* v. *Schlesinger*, supra, 220 Conn. 159.

[9] The dissenting justices express concern that requiring payment from the defendant under the contingency clause even if his sale to a third party never comes to fruition would lead to an "onerous and unusual result" that would be inequitable to the defendant. The dissent is concerned that "an event subsequent to the execution of the sales agreement could reveal that the fair market value is substantially less than the stated purchase price (i.e., environmental contamination revealed upon inspection), causing the purchaser to renounce the sales agreement" but that "the defendant still would be liable under the contingency clause to pay a percentage of the purchase price."

We do not share these concerns. The contingency clause leaves the defendant free to choose whether and under what conditions he will transfer an ownership interest in the premises to a third party. Nothing in the contingency clause requires the defendant to make such a transfer nor does it dictate the terms of a transfer. Thus, if the defendant, mindful of his contingency clause obligations, were concerned about a potential latent condition interfering with a transfer, he could protect himself by evaluating the premises before entering into a sales contract. The defendant could also negotiate for protections from the buyer in the event a latent condition is discovered. The defendant could avoid any such risk altogether by simply choosing not to transfer any ownership interest in the premises within the one year period of the contingency clause. Either way, the contingency clause does not prevent the defendant, a sophisticated business person represented by counsel, from protecting himself from an inequitable result.

In any event, this issue is largely academic in light of the facts of this case. The defendant's contract with Vaughn closed as anticipated. The defendant has not claimed that he did not receive full consideration under the Vaughn contract.

We note, however, that inequities to the plaintiff would arise under the defendant's alternative interpretation. Interpreting the contingency clause to apply *only* to the transfer of legal title at closing would allow the defendant to enter into a contract to sell the premises for a value sufficient to trigger the contingency clause, but to avoid having to pay the plaintiff anything simply by choosing a closing date after the expiration of the one year period in the contingency clause.

[10] The defendant also claims that the trial court's award of postjudgment interest at a rate of 8 percent is "punitive and excessive . . . ." This claim,

however, was inadequately briefed and we decline to consider it. The defendant's briefing on this argument is limited to a paragraph that points to lower prevailing federal interest rates over the relevant time period and notes that the Appellate Court recently upheld an interest award of 2 percent in *Sikorsky Financial Credit Union, Inc.* v. *Butts*, 144 Conn. App. 755, 762–63, 75 A.3d 700, cert. granted, 310 Conn. 931, 78 A.3d 857 (2013). The defendant's brief does not, however, provide any authority or substantive analysis to support a claim that the trial court was bound to apply federal interest rates when awarding interest. Consequently, we have not considered this claim. See *Connecticut Coalition Against Millstone* v. *Connecticut Siting Council*, 286 Conn. 57, 87, 942 A.2d 345 (2008).